A QUAKER ACTION GROUP et al., Appellants,

v.

Rogers C. B. MORTON, Secretary of Interior, et al.

No. 24845.

United States Court of Appeals, District of Columbia Circuit.

Argued June 22, 1971.

Decided Oct. 21, 1971.

Mr. Joseph L. Rauh, Jr., Washington, D. C., with whom Messrs. James F. Fitzpatrick, William A. Dobrovir, Ralph J. Temple and Mrs. Hope Eastman, Washington, D. C., were on the brief, for appellants. Mr. William Basil Calomeris also entered an appearance for appellants.

Mr. L. Patrick Gray, III, Asst. Atty. Gen., with whom Messrs. Thomas A. Flannery, U. S. Atty., John A. Terry, Joseph M. Hannon and Gil Zimmerman, Asst. U. S. Attys., were on the brief, for appellees.

Before McGOWAN, LEVENTHAL and MacKINNON, Circuit Judges.

LEVENTHAL, Circuit Judge:

This is an appeal from an order of the District Court granting appellees' motion for summary judgment. We reverse and remand for trial.

A. *Prior Rulings of This Court*

In 1967, a regional director of the National Park Service, a part of the Department of the Interior, released a memorandum that henceforth a permit would be required in fact for any gatherings in Lafayette Park and on the White House sidewalk, a requirement previously existing only nominally and in regard to all public gatherings in places within the area of the National Capital Region of the Park Service. The memorandum added a new provision, that no permit will be issued as to the White House sidewalk to a group of more than 100 persons, and no permit issued as to La-

fayette Park to a group of more than 500 persons.

In early 1969, District Judge Bryant granted a preliminary injunction to appellants, pending a trial on the merits, restraining the enforcement of the permit regulation setting forth numerical restrictions on demonstrations, on the ground that plaintiffs were likely to prevail on the merits in their contention that application of this regulation violated First Amendment rights. This court declined to reverse the injunction, holding that no abuse of discretion had been shown. But this court modified the order of the District Court to permit enforcement of the regulation to the extent of requiring that groups wishing to protest give notice fifteen days in advance of any planned demonstration. The purpose of this notice requirement was to permit the Government to enjoin the demonstration through a judicial order, on the basis of a showing that the particular circumstances would present a threat to the life or safety of the President. A Quaker Action Group v. Hickel, 137 U.S.App.D.C. 176, 421 F.2d 1111 (1969).

On remand Judge Hart granted summary judgment to the Government, on the basis of affidavits of Secret Service officials concerning the need to protect the President and preserve the integrity of the White House grounds. On February 10, 1970, this court reversed and remanded the case to the District Court, with directions to proceed to trial on an expedited basis, and reinstated the preliminary injunction against enforcement of the 100/500 rule, as modified by this court's requirement of a 15-day notice. A Quaker Action Group v. Hickel, 139

U.S.App.D.C. 1, 429 F.2d 185 (1970). In the course of our opinion, we noted that appellants had raised significant issues regarding the need for the restrictions on picketing contained in the regulations, as well as fairness in their administration, that these findings "were not negatived or superseded by any findings" in the grant of summary judgment. 139 U.S.App.D.C. at 3, 429 F.2d at 187. We did not decide whether the regulation was valid. We cautioned that that issue was to be determined "after a hearing at which evidence, that may be tested on cross-examination, establishes the reasons for the regulatory provisions" and we noted specifically that the issues at trial would include the possible feasibility of other regulatory provisions that would "provide satisfactory safeguards against violence with less interference with the right of peaceful protest." *Id.*

### B. *Proceedings Following 1970 Remand*

A few days thereafter Judge Hart held a conference with attorneys for the parties, during which Government counsel informed the court that the Secretary of the Interior would be commencing new rule-making proceedings by issuing a notice transmitting new park-use permit regulations in proposed form, and offering interested persons an opportunity to participate in the rule-making. At the end of the conference Judge Hart apparently determined not to prescribe an expedited trial schedule for this case.[1]

### *Secretary's Proposal For New Rules*

On July 17, 1970, the Secretary of the Interior issued notice of proposed rule-making regarding the use-permit system in the national parks. 35 F.R. 11485.

---

1. The parties have submitted conflicting affidavits concerning exactly what occurred during this conference. Government counsel states that he not only informed Judge Hart of the Secretary's plans to issue new regulations, but requested that the trial be postponed pending their issuance. Government counsel further alleges that appellants' counsel made no response to this request, that there was no further effort on appel-

lants' part to seek expedited trial, and (at least by implication) that appellants were responsible for any delay in setting the case down for trial.

Appellants' affidavits do not recall any mention of a delay in trial due to preparation of new regulations, and emphatically deny that appellants acquiesced in such delay, either during the conference with Judge Hart or thereafter.

After outlining the background of the controversy, the Secretary, citing both the maintenance of park values, and the need to guarantee Presidential safety, proposed new regulations retaining the 100/500 rule for Pennsylvania Avenue and Lafayette Park. In explaining this proposal, the Secretary put particular emphasis on a letter received from the Director of the Secret Service, contending that larger crowds would jeopardize the ability of "the available security force" to "contain or control a violent group intent upon entering the White House compound." The Secretary refused to question the Director's assessment, holding that the "matter is assigned to the Secret Service Director's competence by statute, and it is he who primarily bears the tremendous responsibilities to assure Presidential security," 35 F.R. 11491 (#138, 1970).

The Secretary's notice provided opportunity for "interested persons" to submit "such written data, views, objections and arguments as they desire to be considered by the Secretary" before the proposed regulations were issued in final form. In addition the Secretary would determine, "in the exercise of his discretion," whether to "allow the presentation of additional views orally before an official of the Department to be designated for this purpose, with the object of receiving into the informal record orally such additional views, etc., as interested persons desire to submit, and to have the designated official conduct such inquiry as may appear to be warranted relative to any particular representations made, or any other aspect of these proposed regulations," id. at 11486. On September 30, 1970, the Secretary issued notice that the proposed regulations, with slight modification, would become effective 30 days after publication in the Federal Register. They were published on October 2, 1970. 35 F.R. 15393. On the same day the Government filed a motion for summary judgment.

A week later, on October 9, 1970, the appellants filed a motion for an order directing the Secretary to show cause why he should not be held in contempt for reissuing the 100/500 regulation in violation of court order. This motion was heard and denied on October 30, 1970, upon assurances from Government counsel that a new notice would be published suspending the effectiveness of these regulations pending further order by this court. Such notices were in fact published. 35 F.R. 17042 (#216, November 5, 1970); 35 F.R. 17552 (#222, November 14, 1970).

*Granting of Summary Judgment to Government*

Although Judge Hart seemed ready at the beginning of the October 30 hearing, to bring the case on for trial,[2] he later agreed to hear argument on the Government's new motion for summary judgment. That motion was heard and granted on November 9, 1970.

In granting the Government's motion, the District Court relied on several arguments put forward by Government counsel. First the court referred to our decision in Women Strike for Peace v. Hickel, 137 U.S.App.D.C. 29, 420 F.2d 597, decided August 1, 1969, as perhaps qualifying the orders in the *Quaker Action* cases to "proceed to trial on an expedited basis."

Second, the District Court stated that the Secretary's regulations were "supported by what the Court believes to be competent reasons in evidence." The Government had contended that the Secretary's judgment must be accepted by the court if supported by substantial evidence on the administrative record, and that it would be error for the court at trial to entertain additional evidence on the same issues.

---

2. Judge Hart expressed concern over recent outbreaks of violence in the country, particularly the alleged attack on President Nixon a few days earlier in San Jose. At one point Judge Hart stated that "in view of what has gone back and forth with the Court of Appeals, . . . the only way we are going to get quickly to it is to have a trial." (10/30/70, Tr. 13.)

Third, the court referred to several recent outbreaks of violence—including the alleged attack on President Nixon in San Jose, the Jackson and Kent State incidents, the suspension of civil liberties in Canada, and restrictions on entry to the United States Courthouse—as support for the reasonableness of the Secretary's regulations, particularly in view of the fact that larger demonstrations could be held on the Ellipse and the grounds of the Washington Monument.

Finally, the District Court held the issue of maladministration to be moot, in view of the Secretary's assurances that he would be "especially cognizant" of the need to provide adequate accommodation in the national parks for the carrying on of First Amendment activity. The court also cited the "prompt and excellent cooperation" of the Department in handling 15-day notices, as well as the Secretary's express directions to process all applications with reasonable promptness, in order of receipt, as proof that the maladministration issue had dropped from the case. Judgment of November 24, 1970, Civil Action 688–69, at 2–3.

C. *Error in Failure To Proceed with Trial In Accordance with This Court's Remand Order*

■ 1. The District Court erred in accepting the Government's contention that our order in this case remanding for trial had been qualified by our decision in the *Women Strike for Peace* case. That case was decided in August, 1969, months before our 1970 order in the present *Quaker Action* case, remanding with direction to proceed to trial on an expedited basis.

At issue in the *Women Strike* case was the validity of the refusal of the Park Service to issue a permit for the erection of a display for a peace rally. It was unclear on the record whether the refusal of the Park Service was based on the size of the display, or its theme, or some broader prohibition on the erection of all displays. The effort to discern a cohesive policy behind the Service's action was further complicated by the fact

that permission to hold the annual Christmas Pageant for Peace, complete with large displays, was routinely granted. Therefore this court remanded to permit the Park Service to present "a more complete and illuminating presentation of Park Service policy than is available on the papers before us." *Id.*, 137 U.S.App.D.C. at 35, 420 F.2d at 603. In doing so, we made the following comment on the possible need for full trial of the issues (*id.*):

> Typically reversal of summary judgment is for the purpose of a trial or evidentiary hearing by the court, and that may prove necessary in this case. But it is not inevitable. It may be obviated if the Park Service undertakes to define and announce a set of coherent park policies, clarifying the matters that are as yet unclear, and perhaps modifying the policies on further reflection as to the interaction of the various interests properly taken into account. Perhaps the case can be disposed of by agreement. If not, the court can consider the validity of Park Service policies in the light of a fuller presentation of the intent and content of those policies.

On the basis of this language, Government counsel argued that our order requiring a full trial no longer applied, since the Secretary had in fact set forth coherent policies, in the form of the new regulations, governing demonstrations in the White House-Lafayette Park area. Judge Hart accepted this argument. (11/9/70 Tr. 61).

In *Women Strike for Peace* we were dealing with a situation significantly different from the problem involved in the case at bar. In that case what was unclear to us was the very policy, the concrete rules as it were, under which the Park Service decided to grant or deny permission to build displays on park land. Here there is no doubt as to the numerical rule restricting demonstrations in the White House area—no more than 100 on the south walk of Pennsylvania Avenue, no more than 500 in Lafayette Park. The issue is whether there is ade-

quate reason for the Secretary to impose such restrictions. The administrative policy involved in the *Women Strike* case had never been formalized and crystallized, and we remanded for further consideration by the agency in the thought that the process of thinking through the policy might resolve or at least narrow the dispute. In *Quaker Action* the policy had been clearly crystallized, and the problem was one of testing its propriety and reasonableness, and for that purpose we directed an expeditious remand procedure including cross-examination at trial.

2. The Government's contention that the controlling judgment is that of the Secretary, and that this is conclusive if supported by substantial evidence, is in effect a renewal of the Government's contention at the very outset of this *Quaker Action* litigation, that any administrative decision regarding the President's safety must be upheld unless "wholly irrational." We rejected that contention, saying that the balancing of First Amendment freedoms against safety requirements required the judgment of the court. (See 137 U.S.App.D.C. at 183, 421 F.2d at 1118):

> The expertise of those entrusted with the protection of the President does not qualify them to resolve First Amendment issues, the traditional province of the judiciary. A balancing of First Amendment freedoms against the requirements of Presidential safety may be left to other agencies in the first instance. But absent a compelling showing—which has not been begun here—that courts cannot evaluate the questions of fact involved in estimating danger to the President, the final judgment must rest with the courts. To enable the court to reach a reasoned conclusion, it is incumbent upon any party who would invoke Presidential safety as a paramount consideration to provide the court with the information necessary to an even-handed decision. * * * There has been no effort here to justify the Government's argument beyond the flat

words of the Secret Service director. First Amendment rights are too precious for sacrifice upon such an unsupported altar.

The Government argues against the propriety of any exacting judicial scrutiny of the Secretary's regulations, using the following line of reasoning: (1) The conduct, as opposed to the content, of speech is subject to reasonable government regulation in the public interest. (2) Here the regulations impose no substantial interference with First Amendment rights. (3) Accordingly no First Amendment issue is presented. (4) Therefore the court must review the regulations solely on the administrative record.

a. The Government's reasoning is not sound. We cannot agree with the bald assertion that a numerical restriction regulation involves no substantial impact on First Amendment activity. The preliminary injunction which we affirmed, with a notice modification, was premised on the importance of the White House as a symbolic site for the exercise of such activity. The District Court stated that "the convenience to defendants of continuing to enforce the numerical limitations and the permit requirements . . . is greatly outweighed by the harm to plaintiffs and all other citizens of deprivation of First Amendment rights." While these findings are not controlling as to ultimate disposition of the merits of the First Amendment issue, they demonstrate the utter futility of arguing, at this late date, that the 100/500 rule does not even involve a constitutional issue. The general concepts of First Amendment freedoms are given added impetus as to speech and peaceful demonstration in Washington, D. C., by the clause of the Constitution which assures citizens of their right to assemble peaceably at the seat of government and present grievances.

b. The Government begs the question when it states that the regulations are reasonable. No one doubts the Government's power to regulate the circum-

stances in which First Amendment activity is conducted, through narrowly drawn regulations aimed at preventing or correcting particular excesses. The Government's long recounting of precedents does nothing more than reiterate the obvious. The question, however, is whether the regulations at issue here are unnecessarily restrictive for the purpose they are designed to serve. As the Supreme Court stated in United States v. Robel, 389 U.S. 258, 268, 88 S.Ct. 419, 425–426, 19 L.Ed.2d 508 (1967), relied on heavily by the Government itself:

> [W]hen legitimate legislative concerns are expressed in a statute which imposes a substantial burden on protected First Amendment activities, Congress must achieve its goal by means which have a "less drastic" impact on the continued vitality of First Amendment freedoms. Shelton v. Tucker, *supra*; [364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231] cf. United States v. Brown, 381 U.S. 437, 461 [85 S.Ct. 1707, 14 L.Ed.2d 484] (1965). The Constitution and the basic position of First Amendment rights in our democratic fabric demand nothing less.

Similar statements may be found in other cases, including United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), where the Court said that governmental regulation of free speech activity would be upheld only if, among other things, "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that [governmental] interest." *Id.* at 377, 88 S.Ct. at 1679.

■ In view of these vital constitutional issues, we do not think it can be said that the validity of the regulations is established by the existence of substantial evidence in the administrative record that the Government officials had a reason for imposing a numerical restriction. The issues concerning the scope of the regulations and the need for their extent and restrictiveness are no closer to resolution now than they were when we first remanded for trial. The Secretary's reasons for re-adopting the 100/500 rule in 1970 are essentially the same as were previously adduced—a letter from the Director of the Secret Service which the Secretary stated he could not re-examine, phrased in terms similar to the affidavit previously submitted to the Secretary, which we previously held was the type of untested assertion that could not support a summary conclusion upholding these numerical restrictions.

We fail to see how the incidents referred to by the District Court, such as the San Jose incident, can resolve the matter. Of course the health and safety of the President are of concern to the citizenry. But this only poses, it does not answer, the question as to whether the officials involved have transformed this concern into an excessive preoccupation with security that is achieved at the unnecessary expense of First Amendment freedoms.[3] We are aware that the issue is difficult and delicate. It is too difficult, too delicate, too dependent on careful assessment and weighing of constitutional rights, to rest conclusively on the untested declaration of an executive official.

3. We now take up the Government's suggestion that appellants are somehow estopped from seeking oral examination of Government officials in the District Court because they failed to seek such examination in the Secretary's rule-making proceedings. The Secretary's notice of July 17, 1970, advised that he regarded the letter determinations of the Director of the Secret Service as conclusive

---

3. Compare Watts v. United States, 394 U.S. 705, 707, 89 S.Ct. 1399, 1401, 22 L.Ed.2d 664 (1969): "The Nation undoubtedly has a valid, even an overwhelming, interest in protecting the safety of its Chief Executive and allowing him to perform his duties without interference from threats of physical violence.

See H.R.Rep.No.652, 64th Cong., 1st Sess. (1916). Nevertheless, a statute such as this one, which makes criminal a form of pure speech, must be interpreted with the commands of the First Amendment clearly in mind. What is a threat must be distinguished from what is constitutionally protected speech."

upon him, that interested persons had opportunity to submit written views and material, and that he might at his discretion provide for the incorporation of oral views of parties into an "informal record" (35 F.R. at 11486.) It seems obvious to us that this was not presented as establishing a right to an evidentiary hearing, with opportunity for oral examination of officials on their untested assertions, so that it could fairly have been taken as an administrative proffer of a procedure equivalent to that which had been accorded by this court to appellants.

The law is only beginning to insist on provision for oral testimony, in appropriate cases, prior to the issuance of administrative regulations. American Airlines, Inc. v. CAB, 123 U.S.App.D.C. 310, 359 F.2d 624 (en banc), cert. denied 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966). Our recent decision in Walter Holm & Co. v. Hardin, 145 U.S.App.D.C. 347, 449 F.2d 1009 (March 19, 1971), is perhaps the first actual holding on this point, predicated on a particular combination of considerations. Even in *Holm,* while requiring some opportunity for oral presentation, we left open the possibility of merely legislative hearings.

■ In this state of the law, we think a party seeking in court an oral examination of officials needed in connection with a substantial First Amendment claim cannot be disabled for failure to exhaust administrative remedies unless there was a clear indication of the availability of such an administrative procedure, an indication wholly lacking here. Accordingly, we need not consider the further issue whether, or under what circumstances, even in a case where such an administrative procedure has been provided the District Court hearing the request for injunction on First Amendment grounds should predicate its crucial First Amendment judgment on its own assessment of the demeanor and testimony of key witnesses, with opportunity in the court to ask clarifying and probing questions (and even to call its own witnesses), rather than taking the case solely on a closed record made out of court.

■ 4. We are not to be taken as bypassing the doctrine of exhaustion of administrative remedies or as suggesting that there is always a right to *de novo* record on constitutional issues. The governing concept as expressed in both judicial doctrine and statute may require even constitutional claims to be determined on the administrative record when the administrative procedure is fair and adequate for presentation of material facts, *e. g.,* National Broadcasting Co. v. FCC, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943).[4] But as the Supreme Court has

---

4. In *NBC* the Supreme Court rejected a claim that the networks, in attacking FCC licensing policy regulations that limited permissible contracts with licensee affiliates, were entitled to *de novo* court review.

In notable contrast to the approach of the Secretary of the Interior, the FCC had prescribed full procedures: it designated a committee of three members of the FCC to make recommendations; it heard 96 witnesses in 73 days of public hearings held over a six-month period, see 319 U.S. at 194–196, 63 S.Ct. 997. These procedures were not challenged as inadequate for the presentation of all material relevant to the ultimate decision. All this material was gathered and studied *before* the agency crystallized its views on the proper scope of its regulations.

Moreover these hearings and regulations were in the setting of a comprehensive regulatory scheme in which Congress clearly envisioned that decisions on issues of broadcast licensing would be made by an expert agency with judicial review limited to a consideration of the administrative record for errors of law or abuse of discretion. As Judge Learned Hand noted in the ruling affirmed by the Supreme Court:

"[If] the evidence went to contradict or overthrow the findings [of the FCC], we could not bring it into hotchpot with the evidence taken by the Commission, without deciding the issues in the first instance ourselves. We have no such power; it would upset the whole underlying scheme of an expert commission, whose order must stand or fall upon such evidence as

noted, *see* McKart v. United States, 395 U.S. 185, 193, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969):

> The (exhaustion) doctrine is applied in a number of different situations and is, like most judicial doctrines, subject to numerous exceptions. Application of the doctrine to specific cases requires an understanding of its purposes and of the particular administrative scheme involved.

■ The exhaustion doctrine has broadest application when Congress has specified a complete administrative procedure, or when an executive official or administrative agency approaches a problem in the first instance by outlining a procedure that permits a full and complete record to be developed before the official or agency crystallizes its position. It has reduced scope when an administrative procedure is only supplementary of existing judicial remedies, without fresh and full consideration prior to crystallization of views. Ogden v. Zuckert, 111 U.S.App.D.C. 398, 298 F.2d 312 (1961).

■ In the instant case, the proceedings at the departmental level were not prescribed by Congress, and were not developed at the outset by the department in its initial approach to the problem, but were only put forward subsequent to the mandate of this court that prescribed a District Court procedure for testing the validity of an executive decision that had been reached without hearings. This circumstance points toward a judicial discretion that avoids any rigid exhaustion doctrine. The soundness of adhering to the judicial procedures we have already outlined is underscored by various factors: The issues raised before us were clearly within the scope of matters before the Interior Department. The entire court record was available to if not lodged with that department. There was no bypassing or failure to identify the problem. There was no request for oral testimony but as we have pointed out the departmental procedures injected while the court action was in train did not proffer the testing on oral examination which this court stressed. The Interior officials, disclaiming expertise on appropriate means to achieve safety, proposed to accept as conclusive the position of the Director of the Secret Service.

Moreover, the new procedure entailed delay prior to ultimate disposition and the possibility of an intervening limitation on constitutional freedoms. A further delay entails continuance of the stop-gap procedure evolved as a purely provisional matter; this is inherently unsatisfactory, as is illustrated by the flaws that have come to our notice (see Section D), and should be protracted only if imperative or clearly useful in the interest of a sound ultimate disposition.

In the circumstances before us we cannot consider the administrative procedure as of such adequacy, or value to the ultimate judicial determination, as to require this case to be either delayed for further executive consideration or limited to disposition on the administrative record. While the precedents yield no case precisely in point they do establish the pertinence of the various considerations we have identified as obviating a rigid application of the exhaustion doctrine. Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1969); Wolff v. Selective Service System, 372 F.2d 817 (2d Cir. 1966); Board of Public Instruction v. Finch, 414 F.2d 1068, 1072 (5th Cir. 1969); United States ex rel.

---

it had before it." 47 F.Supp. 940, 947 (1942).

In the case at bar, in contrast, it is the court that must make the ultimate determinations governing the validity of the regulations; there is no Congressional scheme delimiting judicial review on either the scope of issue or the record; the procedures that this court specified as appropriate for obtaining the perspective needful for the judicial determination are not matched by the administrative procedures later proffered; and while the Interior Department has governance of parks it disavows any claim to the decisive voice of an expert on the issues of presidential safety.

Barr v. Resor, 309 F.Supp. 917 (D.D.C. 1969).

5. Finally, we cannot say that questions of maladministration have now dropped out of the case. Appellants have made numerous allegations concerning recent conduct of Government officials— e. g., that they misleadingly tell sponsors of demonstrations that the 100/500 rule is currently in effect, that they wait until the very last moment to move in the District Court for injunction against specific demonstrations. These allegations, if supported, may provide relevant context for any claim that doubts concerning the regulations may be subdued in the light of assurances of future fair enforcement.

\* \* \* \*

█ We reiterate for emphasis that nothing is to be taken as in any way reflecting our views concerning the ultimate outcome of this case on the merits. What we say is that the 100/500 regulation raises difficult constitutional problems, and no basis was adduced for departing from our ruling that the need for regulations of this scope should be tested through a hearing at which the assertions of the pertinent Government officials may be subjected to the testing of cross-examination.

### D. *Further Procedure*

We conclude with a word as to further procedure.

First we provide for a modification of our outstanding order as required in the interest of justice.

We reiterate the outstanding requirement that groups planning demonstrations in front of the White House or in Lafayette Park must give 15 days advance notice.

We reiterate the requirement that the Government must apply to the court for an appropriate order before individuals and groups can be prohibited from participation in such demonstrations. Pending final determination of this case on the merits, that remains for judicial determination and not the *ipse dixit* of an executive official.

But we think it appropriate to modify that part of our outstanding order which provides that in a case where the advance notice establishes germane and substantial concern for the security of the President, the court may issue forthwith an injunction against the holding of the demonstration.

That procedure has proved to harbor flaws as to instances where the Government has subsequently decided as a matter of executive discretion that any threat posed by a particular demonstration is not so substantial as to require banning of the demonstration. On one occasion the Government was left in the position of failing to enforce the injunctive order which it had obtained from the court.[5]

We think the sound course, at least in the first instance, is to provide that on receipt of the 15-day notice the Government may seek, and in appropriate instances the District Court may issue, an order modifying the outstanding preliminary injunction and vacating it insofar as it restrains enforcement of the regulation against the particular group.

Then in case of any violation by the group, what will be involved is a violation of the Government's permit regulation, with whatever sanctions are provided by law therefor, rather than the special problems of administration of justice

---

5. On April 16, 1971, the Government sought and obtained a District Court order enjoining the Vietnam Veterans against the War from camping on the mall. On April 19, this court modified the preliminary injunction to permit overnight camping in a specified area of the Mall, limited to sleeping in bedrolls. The order of this court was vacated, and the preliminary injunction of the District Court was reinstated, by orders of the Chief Justice (April 20) and the Supreme Court (April 21).

On April 23, the Government applied to the District Court to vacate its injunction, it appearing *inter alia* that the Government had not taken steps to enforce the court's order in the face of violations between April 20 and April 23.

that attach when actions violate a court order.

We do not presently consider whether, in case of violation or threatened violation of the Government's permit regulation (whose enforcement is no longer restrained), the court may issue a further order requiring compliance, so that a further violation may be punishable as a contempt as well as by subjection to the conventional sanctions for violation of the permit regulation.

The case is remanded for trial. There is to be reasonable opportunity for discovery before trial, and oral examination during trial of appropriate Government officials. The preliminary injunction against enforcement of the 100/500 rule remains in effect, pending determination of the merits, subject to the modifications provided by the earlier orders of this court and our decision today.

Remanded.[6]

MacKINNON, Circuit Judge (concurring specially):

Subject to the views expressed in my dissent in A Quaker Action Group v. Hickel, 139 U.S.App.D.C. 1, 429 F.2d 185 (1970), I concur in the result set forth in the foregoing opinion. At oral argument of the appeal in this court it was brought out that the Government had intended to make the Director of the Secret Service available for cross examination at the administrative hearing on the proposed rules. Appellants did not avail themselves of this opportunity and they now say they did not realize that the opportunity existed. Regardless of the reason why the opportunity was not used, I consider it conducive to an early disposition of this matter to concur in the remand so the matter can finally be con-

cluded. I express no opinion as to the extent of permissible cross examination of the Director of the Secret Service, who in many instances may be required to refuse to testify as to state secrets. It has never been doubted that this well recognized privilege extends to the disclosure of matters relating to public security, *see* 8 Wigmore, Evidence § 2378 (McNaughton rev. 1961), and that is precisely the objective of subject rules.

---

6. We do not accept the suggestion that the remand be accompanied by the direction that the case be tried by another judge. The request was made in good faith in order to expedite disposition. But we have no doubt of the purpose of the trial judge to afford the parties a fair and expeditious trial. The transcript reflects such purpose on his part, before he was led into a different and erroneous course by the Government's extractions from our *Women Strike for Peace* opinion. We likewise have no doubt that the trial judge will consider the matter afresh in the light of the evidence as it is developed, and will render a reasoned disposition on the record so made.