**A QUAKER ACTION GROUP et al.,**
**Plaintiffs,**

v.

**Rogers C. B. MORTON et al.,**
**Defendants.**

**Civ. A. No. 688–69.**

United States District Court,
District of Columbia,
Civil Division.

Aug. 22, 1973.

Joseph L. Rauh, Jr., James F. Fitzpatrick, William A. Dobrovir, Ralph J. Temple, Washington, D. C., for plaintiffs.

Gil Zimmerman, Asst. U. S. Atty., Washington, D. C., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I. Findings of Fact

HART, District Judge.

1. The plaintiffs are A Quaker Action Group; Action Committee on American-Arab Relations; Clergy and Laymen Concerned About Vietnam; Jews for Urban Justice and Women Strike for Peace. They are all unincorporated associations whose members, from time to time, attempt to influence the political policies of the Government of the United States. One of the principal means by which they exercise their rights guaranteed under the First Amendment to the Constitution is to demonstrate publicly in Washington, D. C., including demonstrations on the White House sidewalks, Lafayette Park, and the Ellipse. The individual plaintiffs are members and officers of the above-named associations.

2. Defendants are all officials and agents of the United States. Each is sued in his individual and his official capacities. Under the controlling statutes and regulations, defendants have exclusive control and charge over the sidewalk on the north side of the White House between East and West Executive Avenues (hereinafter referred to as the White House sidewalk), over Lafayette Park, and the Ellipse.

3. The National Park Service, Department of Interior, has administrative jurisdiction over the White House sidewalk, Lafayette Park, and the Ellipse. Prior to the issuance on August 10, 1967, of the "Jett Memorandum", numerical limitations were not imposed on the size of public gatherings on the White House sidewalk, although a permit system was in effect for the White House sidewalk.

4. Prior to August 10, 1967, the Metropolitan Police exercised the primary responsibility for supervising demonstrations on the White House sidewalk. Since that date, the Park Police and Metropolitan Police have exercised concurrent jurisdiction over this area, though the Park Police have had the primary responsibility. The Park Police have always had the primary responsibility for Lafayette Park and the Ellipse.

5. On March 23, 1965, the Solicitor of the Department of Interior wrote, then Secretary Udall, giving the Solicitor's opinion that a prohibition of demonstrations in Lafayette Park was unconstitutional. His opinion was that the First Amendment protected such assemblies and that the Department's policies cannot be interpreted to require demonstrations "to be held out of sight and hearing of the very person to whom such petitions are directed". Further, the Solicitor's opinion was that free speech cannot be suppressed nor gatherings forbidden simply because some other person might be inconvenienced or made uncomfortable or because Lafayette Park is too close to the White House and good taste requires more reverence and decorum in that place.

6. On June 7, 1965, the Secretary of Interior, relying on the Solicitor's memo of March 23, 1965, decreed that the exercise of First Amendment rights would be permitted in all public park areas ad-

ministered by the Department of Interior, subject to a permit system. He set forth the policy that permits would not be denied for any of the following reasons:

(a) the presumption that a public gathering would result in a breach of the peace;

(b) the activity would not be in harmony with the objectives for which the area was established;

(c) the activity would interfere with the comfort, convenience, and interest of the general public;

(d) the activity would disrupt the use of the area.

In addition, permits should be granted on a "first come-first served" basis. The "failure to obtain a permit will not in itself be cause for action leading to prosecution".

7. By 1967, the National Park Services' administrative jurisdiction over the sidewalk on the north side of the White House and over all sidewalk on the north side of the White House and over all sidewalks adjoining park grounds was recognized.

8. In the Spring and Summer of 1967, demonstrations in the front of the White House had reached a point where those concerned with the President's safety felt that steps should be taken to reduce the danger posed. On July 25, 1967, Marvin Watson sent a memorandum to the President bringing him up to date on the steps so far taken to resolve the matter as set forth in a memorandum to Marvin Watson, which read as follows:

"MEMORANDUM FOR MARVIN WATSON:

"Several meetings have been held on the subject of picketing and demonstrations in the White House area. These meetings have included representatives of the Secret Service, U. S. Park Police, White House Police, Metropolitan Police, and the Park Service of the Department of Interior.

"Subsequently, this matter has been discussed by Ramsey Clark, Frank Barry (Solicitor at Interior), Harry McPherson, and DeVier Pierson. You have received a position paper from the Secret Service, a memorandum from Charles Sither of your office, and a memorandum from DeVier Pierson.

"All parties are in agreement on the following matters:

"— *Major demonstrations involving thousands of persons*—such as those sponsored by the Spring Mobilization Committee, SANE, and other groups mentioned in the Secret Service memorandum —cannot be tolerated and *must be prohibited* in the White House area. These demonstrations constitute a potential security hazard.

"— The prohibition against picketing and demonstrations on East Executive Avenue, South Executive Avenue, West Executive Avenue, State Place, and Alexander Hamilton Place—this being the entire boundary of the White House grounds with the exception of the Pennsylvania Avenue sidewalk—should be continued.

"— The current practice of permitting demonstrations or picketing on Pennsylvania Avenue sidewalk *without a permit* should *not* be continued.

"— The regulations against blocking entrances or interfering with the use of the sidewalk by the general public should be enforced—and with White House support.

"There is an unresolved difference on one major issue—*whether smaller demonstrations should be absolutely prohibited in this area or whether they should be regulated by a limitation on number of persons*. The Secret Service and Charles Sither—with the concurrence of all police authorities—support an absolute prohibition. The Attorney General,

Interior, McPherson and Pierson support a limitation on numbers.

"Here are the arguments for an absolute prohibition:

"— An attempt to limit numbers would make enforcement difficult or impossible. Once you permit some demonstrators to enter the area, it will be very hard to keep others out.

"— Demonstrations have become increasingly violent with irresponsible leadership. Even a small group often involve "lie-ins" and other repugnant activities which are not in keeping with the dignity of the White House.

"— Nearby areas (the Washington Monument Grounds, Sylvan Theatre, etc.) are more suitable for demonstrations of any size—the White House area and Lafayette Park should be kept clear at all times for the use of the general public.

"— The political cost of a prohibition is exaggerated. The Capitol Grounds have been off limits without much adverse publicity. The majority of the public would support such a prohibition—particularly with the current riots and civil disobedience.

"Those favoring a limitation on numbers proposed that picketing and demonstrations on the Pennsylvania Avenue sidewalk be limited to 100 persons and demonstrations in Lafayette Park be limited to 500 persons. They argue as follows:

"— There is no evidence that small groups of demonstrators pose any security risk to the President. Small groups plotting to break into the White House can use the Pennsylvania Avenue sidewalk as part of the general public—so that prohibitions against picketing and demonstrations do not alter the enforcement problem as to these groups.

"— Requirements for a permit would discourage picketing on the Pennsylvania Avenue sidewalk —but would still not require the arrest of every small group.

"— A prohibition would require publication of revised regulations— and this would encourage testing the prohibition by publicity seeking groups. This places the White House in the posture of stifling dissent each time. (Justice and Interior agree that present regulations may be administered to restrict numbers —but not for an absolute prohibition.)

"— A prohibition at this time would be interpreted as an admission in the face of the current riots— that we are afraid to have even small groups in the White House area.

"The clear preference of the Secret Service is an absolute prohibition. However, they agree that a limitation on numbers and tighter enforcement would be a substantial improvement over the present situation.

"All parties agree that the action taken should be reviewed at a later date to determine if it has resulted in a satisfactory remedy to the problem.

"Whatever the decision as to smaller demonstrations, all parties recommend the following:

"1. That the Park Police have jurisdiction over the Pennsylvania Avenue sidewalk for permit purposes—and that the Metropolitan Police have jurisdiction for general maintenance of law and order including times during which demonstrations are occurring.

"2. That the White House be consulted by the Park Service in advance of the approval or denial of a permit.

"3. That the limitation of numbers be firmly enforced.

"4. That discretion be given to denying a permit for a small demonstration if it is part of a larger demonstration

and the danger exists that the size could not be reasonably controlled.

"5. That the Secret Service be given authority to request arrests for clear violation of the regulations and that a procedure be reached for speedy White House decisions on borderline cases.

"6. That these procedures be set out by memorandum and distributed to the parties concerned so that there is a clear understanding as to the relative responsibility.

"7. Finally—and most important—the agreements reached on major demonstrations requiring permits on Pennsylvania Avenue, and enforcement of regulations against blocking entrances and use of the sidewalk should be implemented.

(s) Rufus Youngblood
U.S. Secret Service

(s) Charles Sither

(s) DeVier Pierson"

On July 28, 1967, the following additional memorandum was sent by Pierson to Watson:

"FOR MARVIN WATSON:

"This supplements my memorandums to you of July 19 and July 25 on the question of picketing and demonstrations in the White House area.

"The unresolved issue is whether demonstrations and picketing should be (a) absolutely prohibited on the Pennsylvania Avenue sidewalk and in Lafayette Park or (b) regulated by limits on their numbers and activities.

"— The Secret Service, FBI, Park Police, White House Police, and Metropolitan Police all favor an absolute prohibition. (This would require amendment of existing Park Service regulations by Secretary Udall. The regulations are published in the Federal Register. While Interior allows thirty days for comments by interested parties before the regulations are final, they have the power to put the prohibition into effect immediately.)

"— The Attorney General, the Solicitor of the Department of Interior, and the Special Counsel to the President believe that some demonstrations and permits should be allowed—but that permits for use of Lafayette Park be limited to 500 persons and for the south sidewalk of Pennsylvania Avenue to 100 persons. The permits should also provide that the gathering is not to interfere with public use of the area and will not block entrances. (This action could be taken administratively without amendment of existing Park Service regulations.)

"Assuming the decision is to limit numbers rather than an absolute prohibition, the following action should be taken:

"1. The Park Service should be given guidelines for the issuance of permits. This would include the following:

"— No public gatherings (which includes picketing and demonstrations) can be held on the Pennsylvania Avenue sidewalk without a permit.

"— Requests for permits by larger groups than the proposed limit will be denied on the ground that "the event is of such nature or duration that it cannot reasonably be accommodated in the particular area applied for".

"— The permit will provide that the pickets or demonstrators are not permitted to block entrances or interfere with the general public's use of the area.

"— A request for permit by one segment of a large group can be denied on the ground that "the event will present a clear and present danger to the public health or safety".

"2. The Park Service should be informally advised that the approval or denial of permits is to be cleared in advance with the White House.

"3. The Park Service should instruct the Park Police that pickets and demonstrators on the Pennsylvania Avenue sidewalk must leave unless and until they have a permit from the Park Service for a public gathering.

"4. A meeting should be held with the Secret Service, White House Police, Park Police, and Metropolitan Police to define their relative responsibilities in the enforcement of order during picketing or demonstrations.

"— The Park Police should have responsibility for determining that a permit has been issued and that the gathering is being conducted in accordance with that permit.

"— The Metropolitan Police should have primary responsibility for the maintenance of law and order. They would be supported by the other police forces.

"— The White House Police should perform their present security function.

"— The Secret Service, in addition to their normal functions, should have authority to request arrests for clear violations of the conditions of the permit. A White House official should be designated to make decisions on borderline cases—and he must be able to do so immediately.

"— Arrests can be made either on the grounds of disorderly conduct under the District of Columbia Code or for violation of the Park Service regulations. Preference should be given to disorderly conduct arrests because subsequent hearings can be expedited.

"If the decision is an absolute prohibition, steps 1 and 3 are not necessary. Secretary Udall would need to be instructed to issue the amended regulations. Step 4 is still needed to clarify authority.

(s) DeVier Pierson"

On August 10, 1967, the National Capital Region of the National Park Service released an official Memorandum, signed by T. Sutton Jett. The Memorandum limited demonstrations on the White House sidewalk to a maximum of 100 participants and demonstrations in Lafayette Park to a maximum of 500 participants (hereinafter referred to as the 100/500 restrictions). Officials commenced to strictly enforce a permit system.

9. During the 1950's, the Secret Service had attempted and failed to secure Congressional legislation prohibiting demonstrations in the White House area. In 1967, no attempt was made to secure Congressional authorization to limit demonstrations on the White House sidewalk and in Lafayette Park.

10. The Park Service justified the 100 person limitation on the White House sidewalk on the ground that larger numbers would distract motorists on Pennsylvania Avenue, force pedestrians into the street, and possibly block the White House driveways. The justification for the 500-person limitation in Lafayette Park was that larger numbers would injure park values and would subject the government to the expense of replacing "injured shrubs and other plants".

11. In October 1967, Mr. Meyer, the Associate Solicitor in the Department of Interior, prepared a "brief" to justify the limitations of the August 10, 1967 memorandum. In his opinion, Mr. Meyer noted that only the court could ultimately determine the validity of the restrictions.

12. On March 19, 1969, Plaintiffs filed a Complaint for Declaratory Judgment and Injunctive Relief. On April 25, 1969, the District Court enjoined the permit system and the 100/500 limitations. On appeal the United States Court of Appeals affirmed, 137 U.S. App.D.C. 176, 421 F.2d 1111, but modified the injunction, instituting a 15-day

notice system, which remained in effect from July 15, 1969 to November 6, 1969.

13. In July, 1969, the Interior Department proposed that the 15-day notice requirement be waived when the President was away from Washington at the time of a proposed demonstration or when no security problems would be presented by the demonstration. The Justice Department opposed this position, suggesting the Interior Department might waive such notice on a case-by-case basis after consulting with the Justice Department and the U. S. Attorney's office.

14. On November 6, 1969, the District Court granted the Government's motion for summary judgment and vacated the injunction. Consequently, the permit system went back into operation from that date through April 6, 1970, when pursuant to the rulings of the Court of Appeals on February 10, 1970, 139 U.S.App.D.C. 1, 429 F.2d 185, and March 6, 1970, and by order of the District Court on April 6, 1970, the permit system was enjoined and the 15-day notice system reinstated. On April 6, 1970, the District Court ordered for the first time an 18-item notice form; this order was reversed and the form was revised by the U. S. Court of Appeals on October 6, 1970. As revised, this notice form has been in use since then.

15. On July 17, 1970, the Interior Department published proposed revisions of the enjoined regulations, which revisions incorporated for the first time the challenged numerical limitations into the Department's regulations. On November 9, 1970, the District Court again granted the Government's motion for summary judgment based upon the recently revised regulations. However, the District Court stayed its order, thereby leaving the injunction and 15-day notice system in effect. On October 21, 1971, the U. S. Court of Appeals, 148 U.S.App.D.C. 346, 460 F.2d 854 reversed the District Court.

16. In November, 1972, the Interior Department published two revisions of the October, 1970, regulations which would permit simultaneous demonstrations on the White House sidewalk and in Lafayette Park and require demonstration groups to provide their own marshals.

17. The White House sidewalk, Lafayette Park, and the Ellipse constitute a unique situs for the exercise of First Amendment rights. Demonstrations there generate great publicity by the news media.

18. Large demonstrations play an "important role" in the exercise of First Amendment rights. A large demonstration is likely to be a more effective communication device than is a small demonstration. The size of a demonstration bears a relationship to the communication of the content of the message and may be more forceful than the content of the message. The larger the demonstration, the greater the likely coverage and exposure by the news media.

19. The White House sidewalk and Lafayette Park have a history of demonstrations. None of these demonstrations in the judgment of the Director of the Secret Service, up to this time, has posed a serious threat to the security of the President in the White House.

20. The Secret Service indicated that only 77 of the last 383 demonstrations on the White House sidewalk and Lafayette Park exceeded the 100/500 restrictions. Plaintiff's Table of Demonstrations for the years 1965–1972 reflects that 66 of the 154 demonstrations in these areas exceeded the 100/500 restrictions, and that only 9 exceeded a 750/3,500 ratio. The police reports and testimony on these large demonstrations reflect, in 9 demonstrations, groups engaging in illegal acts were arrested for having no permit or for having given no notice; in 5 demonstrations, arrests were made for disorderly conduct or other violations; and in 3 demonstrations, violent incidents or injuries were reported. In 3 of the other 88 smaller demonstrations, some violence was reported.

Examples of demonstrations exceeding 100 on the White House sidewalk and 500 in Lafayette Park include:

a) Federal Intervention in Alabama on March 14, 1965, with estimates as high as 15,000 persons in Lafayette Park and as high as 6,000 on the White House sidewalk.[1] Police report stated that, other than several incidents, the group was "very orderly and obeyed police instructions".

b) Martin Luther King Rally on August 5, 1965, with estimated 3,500–5,000 persons in Lafayette Park. Police report indicated no incidents.

c) American Jewish Conference on September 19, 1965, with estimate of about 10,000 persons in Lafayette Park. Police report no incidents.

d) SANE on November 27, 1965, with estimated 20,000–25,000 persons in a march along the White House sidewalk. Police report no incidents.

e) SANE on May 15, 1966, with estimated 8,000 persons in a march on the White House sidewalk. Police report no incidents.

f) CORE and NAACP on March 12, 1965, with estimated 2,400 persons in a march on the White House sidewalk. Police report there were 36 arrests for sit-downs on Pennsylvania and West Executive Avenues.

g) Three simultaneous demonstrations, involving anti- and pro-war groups, on February 20, 1965, with estimated 420 persons on the White House sidewalk. Secret Service report no incidents.

h) Anti-war group on August 6, 1966, with estimated 250 persons on the White House sidewalk. Police report no incidents.

i) Committee to Defend Civil Liberty of Anti-War Movement on August 16, 1966, with estimated 275 persons on the White House sidewalk. Police report no incidents.

j) DuBois Club on August 28, 1966, with estimated 200 persons on the White House sidewalk. Police report no incidents.

k) United Community Corporation on September 26, 1966, with estimated 1,000 persons on the White House sidewalk. Police report no incidents.

l) United Planning Organization on December 18, 1966, with estimated 1,000 persons in Lafayette Park. Police report no incidents.

m) Clergy and Laymen Concerned on January 31, 1967, with estimated 2,500 persons on the White House sidewalk. Police report one incident—one person chained himself to the fence.

n) Maritime Union on March 8, 1967, with estimated 700 persons on the White House sidewalk. Police report no incidents.

o) Health Professionals for Peace in Vietnam on March 22, 1967, with estimated 340–500 persons on the White House sidewalk. Police report no incidents.

p) Anti-war and pro-war groups, simultaneously, on April 28, 1967, with estimated 200 persons on the White House sidewalk. Secret Service report no incidents.

q) Mothers Crusade for Victory over Communism on May 4, 1967, with estimated 200–1,000 persons on the White House sidewalk. Police report no incidents.

r) Poverty Group on May 6, 1967, with estimated 350 persons on the White House sidewalk. Secret Service report no incidents.

s) Spring Mobilization Committee on May 17, 1967, with estimated 300 persons on the White House sidewalk. Secret Service report one incident, involving two arrests.

t) Israeli-Arab groups on June 8, 1967, with estimated 30,000 Jews in Lafayette Park and estimated 200 Arabs on the White House sidewalk. Police re-

---

1. Crowd estimates are notoriously inaccurate and are usually on the high side.

port hostility and tension, but no arrests.[2]

u) National Postal Union on August 29, 1967, with estimated 110–300 persons on the White House sidewalk. Secret Service report no incidents.

v) Womens Strike for Peace on September 20, 1967, with estimated 100 persons on the White House sidewalk. Secret Service report a disturbance occurred when women in Lafayette Park tried to join the group on the sidewalk, after police line had been set up when the size reached 100—several arrests.

w) Americans for Democratic Action on July 11, 1969, with estimated 400 persons on the White House sidewalk. Police report no incidents.

x) Candlelight Moratorium on October 15, 1969, with estimated 30,000 persons, which formed outside the area in question and filed in single file before the White House without stopping and dispersed elsewhere. Police report no incidents.

y) Pro-Israel group on February 23, 1970, with estimated 3,500 persons in a march through Lafayette Park. Secret Service report no incidents.

z) Americans for Democratic Action on May 2, 1970, with estimated 300 persons on the White House sidewalk. Police report no incidents.

aa) Federal Employees Against the War on May 5, 1971, with estimated 1,000–2,000 persons in Lafayette Park. Police report no incidents.

bb) Fellowship for Reconciliation of Clergy and Laymen Concerned on November 8, 1971, with estimated 175 persons on the White House sidewalk. Police report no incidents.

cc) Quakers on May 3, 1972, with estimated 900 persons on the White House sidewalk, moving later to Lafayette Park. Police report the group was "well managed by their leaders" and no incidents occurred.

dd) Washington Area Peace Action Coalition on October 31, 1970, with estimated 500–750 persons in Lafayette Park and estimated 196 on the White House sidewalk. Police report one incident—a person attacked the speaker's podium.

21. Up to the present time, there has never been a serious threat posed to the President while in or about the White House in times of peace. During the Civil War, World War II, and the April 1968 riots, armed troops around the White House were thought to be necessary for the President's protection, but no other occasions have been called to the Court's attention. Past experience alone does not dictate the precautionary measures are unjustified. No President was ever killed in a theatre until Lincoln, in a railway station until Garfield, in a reception line until McKinley, or in an open car until Kennedy.

22. The precautionary measures that may be used to protect the President in the White House may be such as to cover all reasonable contingencies but they may not unduly and unnecessarily impinge on the Constitutional rights of the citizens, including those under the First Amendment. As applied here, the interests involved need to be balanced. The free expression of ideas must be balanced against the protection of the President and other public interests involved.

23. It is felt by those concerned with and charged with the duty to protect the President that the measures designed for that purpose should be "low-key". "Low-key" is used in the sense that the measures, insofar as possible, not be obvious and particularly that they not be challenging. "Low-key" measures include crowd limitations, unobtrusive guards, electronic warning devices, stout but normal appearing fences, advance intelligence and other unobtrusive methods. The opposite of "low-key" would include large numbers of uniformed police, uniformed members of the Armed Forces, open display of small arms, armor, artillery, and patently artificial

---

2. The Court believes the estimate of 30,000 to be grossly exaggerated.

barricades, such as buses. "Low-key" methods have a minimum tendency to excite or antagonize members of a crowd to acts of violence. The opposite, or "high-key" methods have a tendency to provoke lawless acts and violence which can erupt into mob action or panic. An essential basis for this fundamental policy was well stated in the "Report of the President's Commission on the Assassination of President John F. Kennedy" (the "Warren Commission" Report, 1964, at p. 427, 35 F.R. at 11491), as follows:

The President's "very position as representative of the people" precludes the Secret Service from taking "the precautions of a dictator" to shield him (or the White House complex) from danger. "The protection of the President (and the White House complex) must be thorough but inconspicuous to avoid even the suggestion of a garrison state."

This policy judgment has been repeatedly expressed by the Secret Service Director. And the Secret Service view that—because of the unique status of the White House—there should at *all* times be maintained a thorough but inconspicuous "low-profile" appearance, relative to preventive defensive measures undertaken for the effective protection of the Government's Presidential and White House security interests, is crucial on this aspect of the matter.

Aside from the consideration that the White House occupies a unique status in our democratic history, another element independently enters into the judgment. Views corresponding to Warren Commission, appear at page 124 in the Report issued March 1973 by the (Pollak) Committee on the Administration of Justice under Emergency Conditions to the D.C. Circuit Judicial Conference, entitled *The Administration of Justice under Emergency Conditions in the District of Columbia:*

Experience has * * * shown that the public posture of law enforcement authorities at a demonstration or during a riot can * * * help to avert

potential or ongoing disruptions. Premature or excessive shows of force, particularly those involving mass preparedness for riot conditions, can have a disquieting effect on an otherwise passive or curious crowd and should be avoided. By maintaining a profile, suggesting they expect the emergency at hand to remain within bounds or dissipate of its own accord, police can actually encourage such conduct on the part of the participants. And by maintaining a detached and professional attitude even in the face of personal harassment or vilification to which they may sometimes be subjected, police can help to create additional respect for the position they occupy and the laws they are responsible for enforcing.

The Committee there recognized, however (ibid.), the point of common knowledge that, despite the law-enforcement agencies' maintenance of a low-profile appearance of preventive defensive measures, and their undertaking other measures which experience has shown aid in maintaining a preventive "climate that will reduce the chances for disorders":

* * * (D)isorders may still occur; the rules for a demonstration (agreed upon in advance between the Government authorities and the "leaders of planned demonstrations"), intentionally or unintentionally may not be followed resulting in disorder; spontaneous and disorganized rioting may occur; or individuals or groups may engage in pre-planned civil disorder.

The Committee recommended that this low-profile preventive "technique of law enforcement" should continue to be maintained to help "minimize the potential for disorder".

24. In the case of large crowds becoming disruptive or panicky, and their dispersal is indicated or necessary, it is desirable that there be considerable open space contiguous to the crowd so that the dispersal can be carried on quickly and efficiently with a minimum chance of

injury or death to the participants and innocent bystanders. If the adjacent dispersal area is limited or inadequate for the numbers involved, the danger of serious injury and death is increased many fold.

25. The dispersal space adjacent to the front of the White House and Lafayette Park is limited. It includes only the streets leading into the area. The dispersal of very large crowds in this area in case a crowd rioted and/or panicked, might well result in injury and death to many persons and to the destruction of much private property.

26. The dispersal area adjacent to the Ellipse and the Monument Grounds is so great that the dispersal of any unruly or panicky crowd that one can foresee gathering there could be handled with a minimum of injury to those concerned.

27. The distance between the White House fence on the north side and the White House portico is 230 feet. This is an insufficient buffer zone within which to contain a large crowd, should the fence or a gate be breached, without serious danger of death and injury to numerous persons. The fence on the south side of the White House contains no gates and the distance from the Ellipse to the south portico is 840 feet. Thus, a break-through of the fence on the south side would result in considerably more space within which to contain a crowd than would a break-through on the north and would reduce materially the danger of death and bodily injury therefrom. Demonstration crowds in excess of 750/3,000 can be accommodated on the Ellipse without improperly impinging on or restricting First Amendment rights.

28. While the requirement that demonstration groups provide volunteer marshals adds little to effective crowd control, it does materially aid the demonstrators themselves from being injured by traffic, from becoming separated and lost, and in the case of illness or other emergencies.

29. There has been no material abuse of the administration of the permit system since April 24, 1969. There has been no favoritism shown or discrimination exercised against any group or groups. There have been cases of some inefficiency in the system from time to time, but good faith efforts have been made to correct these matters when they surfaced.

30. Lafayette Park, from curb line to curb line is 765 feet long and 487 feet wide. The surrounding sidewalks, which are included in the above, are 22 feet wide. Centrally, located in the park is a statute of Andrew Jackson, surrounded by an iron fence and antique cannon. At the four corners of the park are statues of Lafayette, Kosciusko, Von Steuben, and Rochambeau. At each end of the park are oval fountains—82.5 feet by 45 feet. The remainder of the park is covered by trees, shrubbery, and grass, interspersed with walks 15 feet wide. At various intervals on the walks are benches for public use.

31. The sidewalk in front of the White House is 765 feet by 35 feet. There are no material obstructions on the sidewalk. If demonstrators would maintain military intervals the whole length and width of the sidewalk and remain in formation, a great number of them could be accommodated without danger to themselves, others, or to the President. However, demonstrators tend to bunch up in groups which materially reduces the number that can be safely accommodated on the sidewalk.

32. The restriction on the use of sound amplification on the sidewalk in front of the White House is a necessary one if those in the White House are to be able to carry on their government functions. The present state of the art of sound amplification is such that sound could be amplified from the sidewalk to an extent that would seriously hamper or stop work in the White House.

33. The 24 hour and 7 day restrictions on demonstrations by one

group are necessary unless we are to reserve the exercise of First Amendment rights in front of the White House for only one group or for a limited number of groups. All segments of society, all shades of thought, all interested and concerned organizations must have an equal opportunity in this regard.

### Conclusions of Law

 1. The present 100/500 limitations on the number of demonstrators in front of the White House is more restrictive of First Amendment freedoms than is essential for the furtherance of the following governmental interests:

a. Protection of the President and/or White House.

b. Rights of citizens to use the sidewalks and the streets in front of the White House and Lafayette Park for the normal uses for which they are provided and maintained.

c. Safety of citizens using facilities as in b. above.

d. Safety of demonstrators.

e. Ecology of Lafayette Park.

f. Alternate locations for large protests.

2. Any limitations of less than 750/3,000 would be more restrictive than is essential for the furtherance of governmental interests as set forth in 1. above.

3. Immediately to the rear of the White House, in the Ellipse, and, if necessary, in the Monument Grounds, any number of people that it is deemed likely to participate in any one demonstration can gather without hinderance to their exercise of First Amendment freedoms, and without substantial danger to themselves and the general public. In the case of such very large crowds, which are rare, it is likely that in the Ellipse, the exposure will be as great, the news media coverage as great, and the message will be carried forward as well, if not better than, if the same demonstrations were held in front of the White House. If there be differences, they would arise only from the dangers involved in crowding large numbers of demonstrators into an inadequate space with no reasonably available dispersal zone.

 4. The permit requirement of 36 CFR 50.19 does not confer impermissibly broad discretion on government officials to grant or deny permits in violation of First Amendment rights except as set forth in conclusions 1. and 2. above, in this connection:

a. The requirements of and standards for a permit or notice are reasonable.

b. The restrictions on rush hour demonstrations are reasonable.

c. The ban on the use of sound amplification systems on the White House sidewalk is reasonable.

d. The requirement of marshals for simultaneous demonstrations in Lafayette Park and the White House sidewalk is reasonable.

e. The ban on continuous demonstrations lasting beyond 24 hours or beyond 7 consecutive days by one group is reasonable.