**VIETNAM VETERANS AGAINST THE WAR/WINTER SOLDIER ORGANIZATION, a Non-for-Profit Illinois corporation, et al.**

v.

**Rogers C. B. MORTON, Secretary of the Interior, et al., Appellants.**

**No. 74–1667.**

United States Court of Appeals,
District of Columbia Circuit.

June 28, 1974.

On Appellee's Suggestion for Rehearing
En Banc Aug. 19, 1974.

Bazelon, Chief Judge, filed a statement as to why he voted to deny rehearing en banc.

Earl J. Silbert, U. S. Atty., John A. Terry, Arnold T. Aikens and Gil Zimmerman, Asst. U. S. Attys., for appellants.

Leonard H. Becker, Washington, D. C., for appellee.

Before MacKINNON and WILKEY, Circuit Judges.

PER CURIAM:

This is a case of second impression in this jurisdiction. Once before, in 1971, this court was a way station as emergency adjudication sped through the Federal Court system.[1] Whatever necessity originally justifies it, one of the drawbacks to speedy adjudication is that it frequently leaves little but the result for later litigants and judges to follow. Some would find this quite sufficient, yet the instant action, although clearly governed by the result of the 1971 controversy, has nevertheless been vigorously reargued *de novo*. The purpose of publishing this opinion is to avoid such repetitious resort to the judicial process, at least on the issue twice litigated.

### I.

The appellees, Vietnam Veterans Against the War/Winter Soldiers Organization, a non-profit Illinois corporation (hereinafter VVAW), filed suit 10 May 1974 in United States District Court seeking to enjoin the Superintendent of the National Capital Parks and his superiors from withholding from them a permit to establish a "symbolic campsite" on the Mall[2] as part of a

---

1. See note 9 *infra* and accompanying text.

2. The Superintendent based his refusal on 36 C.F.R. § 50.27(a) which in relevant part reads:

Camping is permitted only in areas designated by the Superintendent [of National Capital Parks] who may establish limitations of time allowed for camping in any public camping ground.

demonstration planned for Washington, D.C., from 1 to 4 July 1974, inclusive.[3] After each side moved for summary judgment, oral argument was heard. On Friday, 28 June 1974, U. S. District Judge Richey, by opinion and order, granted plaintiff's motion for summary judgment, and ordered the defendant Superintendent of the National Capital Parks to permit the VVAW to encamp around the clock for the four-day period.[4] The District Court also held that 36 C.F. R. § 50.27(a) was unconstitutionally vague because it left the Superintendent with an unfettered discretion to allow nocturnal activities by favored groups, while prohibiting other activities by the less popular simply by biased construction of the undefined term "camping."[5]

Since only the weekend remained before the arrival of the VVAW, the Government moved this Court for summary reversal of the District Court's order the afternoon it was entered.[6] Because of the need for expediting the matter if the parties were to be informed of their status before the encampment was scheduled to begin, and in order to permit the parties to appeal further if they so desired, we granted that motion by brief order on Friday evening, 28 June, citing "the authority of Morton, Secretary of

Title 36 C.F.R., promulgated by the Secretary of the Interior pursuant to 16 U.S.C. § 3, contains regulations governing parks, forests and memorials. Chapter 1, part 50 of that title, pertaining to the National Park Service, Department of the Interior, embodies regulations governing the use of National Parks in the Washington, D. C. area —the National Capital Parks (hereinafter NCP). The challenged regulation is part of this chapter.

Thus, appellants in this suit are the Secretary of the Interior, his subordinate, the Director of the National Park Service, and his subordinate, the Superintendent of National Capital Parks, the operative government agent who has consistently denied the VVAW and others permission to camp outside designated areas.

The controverted area in this as well as the 1971 litigation is that part of the Mall circumscribed by Washington and Adams Drives and 3rd and 4th Streets (in Washington, D. C.). There is nothing in the record which indicates that any person or group has ever been *permitted* to camp overnight in that area. As set out more fully below, the VVAW did occupy this site for four nights in 1971. *See* note 9 *infra* and accompanying text.

3. Formal application for a permit to parade (under 36 C.F.R. § 50.19) and to camp was made to the Superintendent on 4 March 1974. At a meeting on 22 March with the Superintendent's delegate, the VVAW announced that its purpose in mobilizing 1,000 adherents was to rally support for unconditional amnesty for all Vietnam-era war resisters, for increased Federal benefits for Vietnam-era veterans, and for an end to American military presence in Southeast Asia.

The application enumerated several cognate nocturnal activities proposed for the camp-site including a concert and public *fora* on topics of note. VVAW felt (from the 1971 experience) that the base camp on the Mall would serve as a staging area for planned daytime marches—to the Veterans' Administration, the Department of Justice, the Lincoln Memorial—and would constitute "a continuing vigil"—a focal point for media coverage and a magnet to attract other citizens wishing to express their views on these topics.

By letter dated 1 May 1974, the Superintendent issued a permit authorizing the use of the Mall area for rallies, assemblies and dispersals. The Superintendent also approved the parade routes proposed by VVAW. In addition, the permit sanctioned the erection of first aid and administrative tents on the Mall, and allowed use of a mobile sound system, signs and placards. The Superintendent denied VVAW's request "to utilize the Mall area for camping purposes, including overnight occupancy and cooking." This suit followed within a fortnight.

4. Vietnam Veterans Against the War v. Morton, 379 F.Supp. 9 (28 June 1974).

5. *See* notes 16–23 *infra* and accompanying text.

6. We acted expeditiously because the issues were clear, and reversal of the District Court was compelled because it had directly contravened the controlling precedent. *See* note 9 *infra* and accompanying text. We were also motivated by a desire to avoid a repetition of 1971, when the VVAW began its Mall encampment under color of the lawful authority of this court's order, which was subsequently vacated by the Supreme Court. This time we issued a dispositive declaration of the parties' rights in time to allow the appellees to secure alternative accommodations.

the Interior v. Quaker Action Group et al., 402 U.S. 926 [91 S.Ct. 1398, 28 L. Ed.2d 665] (1971)," and the court *en banc* later denied plaintiff's motion of Saturday morning, 29 June, for rehearing or reconsideration *en banc*.

## II.

■■ The requirements for summary reversal of a District Court order are familiar to the point of cliche,[7] and need not be recapitulated here. Summary reversal was dictated here because the order was issued despite the unequivocal decision of the Supreme Court to the contrary in 1971, concerning the same litigants and resolving the same legal issues.[8] However heavy the burden may be for a litigant to earn summary reversal in the normal case, the District Court's failure to defer to and follow the Supreme Court's 1971 order clearly warranted that disposition in this case.[9]

■ By its order of 21 June 1971, reinstating (after à reversal by this court) District Judge Hart's injunction forbidding the VVAW from camping on the same part of the Mall, the Supreme Court accepted the finding of Judge Hart that overnight camping was not activity within the purview of the First Amendment and that the blanket ban on camping in nondesignated areas was a reasonable exercise of supervisory authority over the public parkland. We are bound by that determination.[10] Since

7. Summary reversal is an extraordinary remedy, for which the proponent has a "heavy burden of demonstrating both that his remedy is proper and that the merits of his claim so clearly warrant relief as to justify expeditious action." United States v. Allen, 133 U.S.App.D.C. 84, 85, 408 F.2d 1287, 1288 (1969) ; Natural Resources Defense Council, Inc. v. Morton, 148 U.S.App.D.C. 5, 10, 458 F.2d 827, 832 (1971).

8. Morton v. Quaker Action Group, 402 U.S. 926, 91 S.Ct. 1398, 28 L.Ed.2d 665 (1971).

9. On Friday, 16 April 1971, the Justice Department sought an injunction in District Court to prevent the VVAW from establishing a base camp on the Mall incident to their proposed demonstration of 19–23 April 1971. Judge Hart granted the injunction. A Quaker Action Group v. Morton, C.A. No. 688–69 (D.D.C.1971). The order therein defined the terms "overnight camping" and "campsite" as "sleeping activities, or making preparations to sleep (including the laying down of bedrolls or other bedding), or making any fire, erecting any shelter, tent, or other sleeping accommodation structure, or doing any digging or earth breaking, or carrying on any cooking activities . . . . " Judge Hart ruled that the VVAW could demonstrate on the Mall only from 9 :00 a. m. to 4 :30 p. m. daily.

After oral argument on the VVAW's motion for summary reversal, this court on Monday, 19 April 1971, modified Judge Hart's order "so as not to prohibit appellants from utilizing [the Mall] at night as well as by day, for the purpose of a so-called campsite base as an incident to or as part of their public demonstrations and gatherings, and for the purpose of sleeping in their own equipment, such as sleeping bags, on that portion of the

Mall." A Quaker Action Group v. Morton, No. 71–1276 (D.C.Cir. 19 April 1971). Thus, when the VVAW members began to gather that evening on the Mall, they proceeded to erect their now legal symbolic encampment.

The next morning (20 April), the Solicitor General presented an emergency application for a stay of this court's order to Chief Justice Burger, acting as the Circuit Justice for the District of Columbia Circuit. The Chief Justice issued an order at 6 :00 p. m. on 20 April vacating this court's order of 19 April and reinstating Judge Hart's prohibitory injunction. The VVAW remained on the Mall that evening at sufferance, pending the petition to the full Supreme Court to review Chief Justice Burger's action.

Late on the afternoon of 21 April, the full Supreme Court, Mr. Justice Douglas not participating, upheld the Chief Justice and by order vacated the order of this court and reinstated "with full force and effect" the preliminary injunction of the District Court. Morton v. Quaker Action Group, 402 U.S. 926, 91 S.Ct. 1398, 28 L.Ed.2d 665 (1971). That the injunction was ultimately dissolved because the Justice Department declined to enforce it does not affect the quality or finality of the judicial determination of the rights of the parties. Since the Supreme Court held in 1971 that the Government could enjoin the VVAW from camping on the Mall in violation of 36 C.F.R. § 50.27, the VVAW is obviously not entitled to camp on the same section of the Mall in 1974.

10. The Solicitor General's major argument for reversal of this court's 1971 order was that camping, as regulated by 36 C.F.R. § 50.27, is not expressive conduct, and thus a total ban on camping on the Mall is not in

appellees herein seek nothing beyond that which the Supreme Court denied them in 1971, the appellant Government officials are entitled to summary judgment on remand.

## III.

This is not a case in which this court needs to balance the seminal freedom of political expression against society's proper concern for public order, personal safety, or security of property.[11] The permit obtained by the VVAW allows its members to propound their views by assembling, speaking, pamphleteering, parading, carrying banners, and erecting whatever structures they deem necessary to effective communication of their message. They are only prohibited from cooking and camping overnight,[12] activities whose unfettered

any sense a prior restraint of First Amendment activity. *See, e. g.*, Carroll v. President and Commissioners of Princess Anne, 393 U.S. 175, 181, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968) ; Freedman v. Maryland, 380 U.S. 51, 57, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965) ; Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963). *See generally* Blasi, Prior Restraints on Demonstrations, 68 Mich.L.Rev. 1481 (1970).

The Supreme Court, by its reversal of this court's order in 1971, found camping to be outside the scope of the First Amendment. Since the District Court's action in the instant case was premised on the applicability of the First Amendment to the proposed encampment, summary reversal is warranted on that ground alone.

11. *See generally* Pell v. Procunier, 417 U.S. 817, 826, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974) ; Gregory v. Chicago, 394 U.S. 111, 125, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969) ; Princess Anne, note 10 *supra;* Adderly v. Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed. 2d 149 (1966) ; Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965) ; Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963) ; Poulos v. New Hampshire, 345 U.S. 395, 73 S.Ct. 760, 97 L.Ed. 1105 (1953) ; Cox v. New Hampshire, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941) ; Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). The no-camping regulation, which does not involve the Government even indirectly in control of political expression, stands on much firmer ground than the NCP regulation purporting to limit the size, place and compass of demonstrations conducted in Washington area parks. *See* 36 C.F.R. § 50.19 ; A Quaker Action Group (I) v. Hickel, 137 U.S.App.D.C. 176, 421 F.2d 1111 (1969) (modifying preliminary injunction against application of regulations) ; A Quaker Action Group (II) v. Hickel, 139 U.S. App.D.C. 1, 429 F.2d 185 (1970) (reversing grant of summary judgment for U. S. and remand) ; A Quaker Action Group (III) v. Morton, 148 U.S.App.D.C. 346, 460 F.2d 854 (1971) (reversing another grant of summary judgment for Government and further remand) ; A Quaker Action Group (IV) v. Morton, 362 F.Supp. 1161 (1973) (District Court order upholding regulations with modifications), appeal pending, No. 73–2061 (argued 27 Feb. 1974) ; *see also* Women Strike for Peace v. Morton, 153 U.S.App.D. C. 198, 472 F.2d 1273 (1972) (total ban under 36 C.F.R. § 50.19 on erection of structures incident to demonstration invalidated).

12. Appellees argue that permitting them free expression of ideas without regard to time of night, while prohibiting them from "camping," defined as sleeping or laying down bedrolls incidental to such slumber, is an unenforceable absurdity, because it allows them to occupy the same plot of ground for the same period of time (to the exclusion of other users) as if they had been permitted to establish their "symbolic campsite."

While it is somewhat anomalous to allow citizens to sit and even recline on the ground, while enjoining them from sleeping, the District Court's injunction in this case would have had far-reaching and deleterious consequences. By permitting the VVAW to camp simply because they had established a nexus between that encampment and the message they wished to convey, the District Court order would have required that *in futuro* the Superintendent of NCP in the exercise of his discretion under 36 C.F.R. § 50.27 examine the nature of each organization which applied for a camping permit and consider the tenor of its message in order to identify those groups entitled to camp. That task would have been an open invitation to the very type of arbitrary exclusion of disfavored voices appellees allege is behind the Superintendent's denial in this case. *See* Hague v. CIO, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939), and cases cited in note 10, *supra.*

The line of demarcation between camping (as defined by Judge Hart and reinstated by the Supreme Court in 1971), and other nocturnal activities governed by 36 C.F.R. § 50.19, while not iridescent, is still a reasonable distinction necessary to insure the optimal use

exercise is not crucial to the survival of democracy and which are thus beyond the pale of First Amendment protection.[13]

█ Even considering the issue as an original proposition, without the benefit of Judge Hart's findings and the Supreme Court's approval in 1971, all of the District Court's discussion of free speech this year fails to convince us that there is any connection between freedom of speech and what the appellees were forbidden to do by the United States Park Service regulations, camp overnight in a public park—in contradistinction to their exercise of free speech rights by usual modes during the day,

which the appellees were specifically permitted to do. Camping overnight in a public park has no more relevance to free speech than say, digging latrines in a public park, and we think the United States Park Service may regulate both.

██ The sensitivity of the District Court this year to the need for media coverage of the symbolic campsite as a focal point is a distortion of First Amendment values. What the litigant's press agent seeks and what the public interest requires differ widely. Although every man is entitled to make his remonstrance, no man is entitled to make such a remonstrance that it will be carried on all three television networks.[14]

of parkland by all citizens. Such reasonable legislative line drawing is not ordinarily subject to judicial alteration. Williamson v. Lee Optical Co., 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955).

13. The District Court's declaration that freedom of expression has a preferred position in our pantheon of constitutional values is certainly unobjectionable. *See* Shuttlesworth v. Birmingham, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); Gregory v. Chicago, note 11 *supra;* Cox v. Louisiana, note 11 supra; Niemotko v. Maryland, 340 U.S. 268, 71 S.Ct. 325, 328, 95 L.Ed. 267, 280 (1951); Hague v. CIO, note 12 *supra.*

However, Mr. Justice Rehnquist recently reminded us that "[t]he importance of a right does not, by itself, determine its scope, and therefore we must continue to hark back to the historical origins of the privilege, particularly the evils at which it was to strike." Michigan v. Tucker, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974).

The origins of the First Amendment are catalogued elsewhere. *See* New York Times Co. v. Sullivan, 376 U.S. 254, 271–277, 84 S. Ct. 710, 11 L.Ed.2d 686 (1964); C. Warren, Congress, The Constitution and the Supreme Court, Ch. 3 (rev. ed. 1935) (Congressional debates at time of Amendment's passage); 2 J. Story, Commentaries on the Constitution of the United States § 1882 (5th ed. 1891) (abuses sought to be curbed).

While there are academic differences concerning the insidious practices the First Congress sought to eradicate by passage of the First Amendment, there is no historical evidence that the draftsmen of the Free Speech Clause sought to impose upon the Government any affirmative duty to maximize the effectiveness of or widen the audience for the loquacious citizen. *See* Z. Cha-

fee, Free Speech in the United States 18–21 (1941) (libertarian's historical view); L. Levy, Legacy of Suppression—Freedom of Speech and Press in Early American History vii–viii (1960) (revisionist, cynical view of Clause's origins); Anastaplo, Book Review, 39 N.Y.U.L.Rev. 735 (1964) (disputing Levy thesis); *see also* note 15 *infra.*

14. The appellees allege in their complaint that since the 1971 encampment "attracted an outpouring of press attention[,] . . . [its] First Amendment value is beyond dispute." Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction at 9. This invocation of First Amendment protection solely by virtue of the public relations value of the encampment was unquestioningly accepted by the District Court, which stated, "[p]ractically speaking, it cannot be overlooked that the 1971 encampment, in its central location on the Mall was able to attract *considerable media attention* which is indispensable to the *effective* dissemination of the veterans' viewpoints." VVAW v. Morton, 379 F.Supp. at 12 (28 June 1974) (emphasis added).

To the extent that these statements of the District Court imply that the Government is compelled by the First Amendment to permit the most *effective* means of expression chosen by the citizen, they are disavowed. The Supreme Court has rejected the view that citizens have the unqualified right to determine the time, place and manner of their expression. *See, e. g.,* Lloyd Corp. v. Tanner, 407 U.S. 551, 567, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972); Adderly v. Florida, 385 U.S. 39, 48, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966); Cox v. Louisiana, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965). However slightly the ban on camping may diminish the quality of appellees' demonstration, it is not an in-

## IV.

The District Court further implied that the ban on camping had been unevenly enforced.[15] Some of the exceptions cited in its opinion, however, are clearly not examples of camping.[16] Of all the instances in the record, only the Bonus Army encampment of 1932,[17] Resurrection City in 1968,[18] and the Mayday Tribe bivouac in 1971 [19] were in any sense deviations from the literal application of section 50.27. Far from constituting an unconstitutional preference for favored groups, the Government action in those cases was merely a flexible compromise in the face of potential disruption of the public peace. Such emergency action does not create an entitlement on other groups to a similar variance from the usual prohibition. On the contrary, solicitude for the rights of every citizen to the even-handed enforcement of the law compels the maintenance of the absolute ban inviolate, subject only to discretionary exceptions in the interest of public safety.

The District Court also held 36 C.F.R. § 50.27 to be unconstitutionally vague; since "camping" is not defined, the Superintendent allegedly possesses unfettered discretion to permit favored nocturnal activities by designating them "non-camping" and to prohibit disfavored activities by denominating them "camping." [20] The District Court's 1974 determination rested upon the erroneous premise that the term "camping" was undefinable.[21] Judge Hart's 1971 order defined the term,[22] and the Supreme Court by reinstating that order "with full force and effect" bestowed its imprimatur on that definition.

While the Government brief in the District Court cited and argued the com-

---

fringement in fact upon the right to demonstrate.

We find this same principle with regard to other rights. *Cf.* Michigan v. Tucker, note 13 *supra* at 2365 of 94 S.Ct. (accused not entitled to perfect trial, only fair one; suspect not entitled to perfect investigation, only good faith one).

15. *See* note 20 *infra* and accompanying text.

16. The District Court cited all-night rock concerts (of which there was no evidence in the record), the annual Fourth of July fireworks display at the Washington Monument (which terminates before midnight), and the Sylvan Theatre summertime Shakespearean productions. While spectators at the Sylvan do recline on blankets, they are clearly not "camping" and all participants—both actors and audience—leave the park by midnight. The appellees also cite their own 1971 encampment as a deviation which supports their theory that the prohibitory rule of § 50.27 is honored primarily in the breach. Such an argument ignores the fact that their 1971 plan was consistently opposed by the Superintendent and only succeeded by virtue of this court's order reversing Judge Hart and the confusion attendant the hasty adjudication of its soundness.

17. In late May 1932 an unorganized group of unemployed Great War veterans descended upon Washington to petition Congress to accelerate the maturity date of their "Bonus" certificates (not payable until 1945). The authorities were cooperative at first, arranging quarters for many of the 15,000 men and permitting others to build hovels in various open spaces in the city. The leader of the "Bonus Army," Walter W. Waters, maintained a firm hand over his charges which, with the generally sympathetic attitude of the local population, helped create an amicable mood during May and early June. When Congress narrowly defeated the Bonus Bill, however, the veterans' mood turned sullen. Their eviction was eventually effected by troops under the command of General Douglas MacArthur on 28 July 1932. The Bonus Army, of course, never formally obtained permission to camp on public parkland.

18. The Department of the Interior decided not to oppose the encampment of 5,000 civil rights advocates in May 1968 on a section of the Mall near the Lincoln Memorial that to this day is known as Resurrection City. The encampment lasted four weeks and the citizens embarked peacefully.

19. A temporary bivouac was provided in West Potomac Park for a brief period in early May 1971, as a means of monitoring the activity of a group whose intent to engage in disruptive acts was a matter of public record. The terms of the agreement never permitted camping, however.

20. The District Court found "no consistent rationale or practice in the Director's [*sic*] granting of permits for nighttime activity." VVAW v. Morton, note 4 *supra*, 379 F.Supp. at 13.

21. *Id.*

22. *See* note 9 *supra*.

plete dispositiveness [23] of the Supreme Court order of 21 April 1971 reinstating Judge Hart's order forbidding overnight encampment on the Mall, the District Court nowhere in its ten-page opinion mentioned the Supreme Court's decision in the 1971 case. Instead, the District Court cited the fact that these same litigants were successful in encamping on the Mall for several days.[24] We think the relevant precedent for the District Court to have followed was the unanimous Supreme Court's decision approving Judge Hart's 1971 order, not the actions of mass demonstrators in violation of that order.

Appellants' motion for summary reversal is granted and the District Court will grant summary judgment for the appellants.

So ordered.

### ON APPELLEE'S SUGGESTION FOR REHEARING EN BANC

Before BAZELON, Chief Judge, and ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges.

### ORDER

Appellant has filed a suggestion for hearing *en banc*. On consideration thereof, it is

Ordered by the Court en banc that the suggestion for rehearing en banc is denied, a majority of the Circuit Judges who are in regular active service not having voted in favor of it (Rule 35, Federal Rules of Appellate Procedure).

Statement of Chief Judge BAZELON, as to why he voted to deny rehearing *en banc*.

I agree with the result expressed in the *per curiam* opinion issued by the motions panel in support of its order of June 28. However, in view of the overbroad language the motions panel employs in reaching that result, language which, to my mind, may be misunderstood as signaling a retreat from the position advanced in A Quaker Action Group v. Morton, 148 U.S.App.D.C. 346, 460 F.2d 854 (1971) and Women Strike for Peace v. Morton, 153 U.S.App.D.C. 198, 472 F.2d 1273 (1972), I am compelled to state my individual views concerning the basis of the order of June 28.

My point of departure with the Court's opinion is the assertion that camping on public property is per se a regulatable activity and can never have a connection with protected lobbying activity. I see no need to go that far in this case which has been heard in a summary manner and which has not offered us an opportunity to explore the full ramifications of the connections, if any, between camping and protected lobbying activities. While the matter is certainly not free from doubt, it is at least an open question whether in the proper case the denial of safe [1] public

---

23. "Judge Hart's 1971 order issued in respect of VVAW in connection with the *Quaker Action* litigation, Civil Action No. 688–68 (Govt. Ex. 2b), defined the terms 'overnight camping' and 'campsite' to include 'sleeping activities', or 'making preparations to sleep (including the laying down of bedrolls or other bedding)'. It was this District Court order which the Supreme Court's order of April 21, 1971 (Govt. Ex. 2f, reported 402 U.S. 926, [91 S.Ct. 1398, 28 L. Ed.2d 665]) 'reinstated with full force and effect'. Thus, the present litigation is an exact factual repetition of that 1971 controversy between the Government and VVAW which was taken to the Supreme Court, and there resolved under the *Quaker Action* rubric adversely to VVAW/WSO.

    *    *    *    *    *

"We assert that the Supreme Court's order of April 21, 1971 reinstating 'with full force and effect' Judge Hart's order in respect of VVAW (Govt. Ex. 2f, reported 402 U.S. 926, [91 S.Ct. 1398, 28 L.Ed.2d 665]) is entirely dispositive of the same point involved in the present litigation: Camping is a constitutionally regulable activity, not a First Amendment right. VVAW/WSO has no First Amendment right to camp on the Mall, incident to its demonstration." Government Brief at 5, 6.

24. VVAW v. Morton, 379 F.Supp. 9 at 10.

1. I recognize, of course, that an administrative judgment that certain camping activity will jeopardize the public health and safety would, if supported by a record compiled in an adversary hearing, be entitled to great

facilities which could be used for camping by lobbyists might result in an impairment of First Amendment values. This impairment could occur through discriminatory denial of camping facilities to unpopular groups, by detering any lobbying in the first place or by limiting the media exposure of such lobbying to a significant degree.

I believe the case before us can be disposed of without reference to the broad assertions in the Court's opinion. The Superintendent, while denying the request for a camping permit, did grant a number of other permits which greatly facilitated the lobbying efforts by the Veterans.[2] His exercise of discretion in the past in regard to camping on the Mall has also been to facilitate lobbying activities.[3] There is not a scintilla of evidence in the record that the Veterans' efforts were in any respect retarded by the denial of the camping permit. It follows that the Superintendent's exercise of discretion in this case and past cases concerning camping and other nocturnal activities on the Mall indicates the sort of affirmative respect for First Amendment values required from administrators. For that reason, and that reason alone, I concur in the grant of summary reversal of the District Court's order in this matter.

I hasten to add that we might have a different case if we were confronted with a clear legislative judgment that dictates of public order and safety require a prohibition on camping. However, we are faced instead with a broad and undefined grant of power to the Superintendent.[4] Since *ad hoc* decisions

pursuant to that power are not, to my mind, entitled to the same respect and weight as a considered legislative or even administrative policy on camping, I am unwilling to hold in this case that judicial review of such *ad hoc* administrative decisions cannot in the proper case include a requirement that the administrator permit lobbying groups to use public facilities for symbolic or actual campsites. In sum, I believe that in judicial review of this sort of administrative discretion, we are authorized to take a broader view of First Amendment values than if we were faced with a considered legislative judgment.[5]

I am also disturbed by the Court's heroic efforts in erecting the 1971 Supreme Court summary order affirming a preliminary injunction into a definitive precedent on the issues I have just discussed. It is certainly elementary jurisprudence to note that the scope of a precedent is defined by the reasons advanced in support of the decision. Here we have a precedent with absolutely no supporting reasons and, indeed, with no exact statement of the issue being decided. Thus, that order could very well be no more than a decision that the litigation should proceed through normal channels to facilitate complete judicial consideration of the issues the case presented. It could also be a holding that on the specific facts of the 1971 permit request there was no First Amendment issue. In sum, the *per curiam's* sweeping statements must stand or fall on their own reasoning and not that imputed by speculation to the Supreme Court.

---

weight in any adjudication of the relation of camping and First Amendment values. There is no such record in this case. *Cf.* EDF v. Ruckelshaus, 142 U.S.App.D.C. 74, 439 F.2d 584 (1971). *See also* A Quaker Action Group v. Morton, 148 U.S.App.D.C. 346, 460 F.2d 854 (1971); Women Strike for Peace v. Morton, 153 U.S.App.D.C. 198, 472 F.2d 1273 (1972).

2. *See* note 3 of the *per curiam* opinion.

3. *See* p. 58 of the *per curiam* opinion.

4. *See* 16 U.S.C. § 3 (1970).

5. *See* Schneider v. Smith, 390 U.S. 17, 88 S. Ct. 682, 19 L.Ed.2d 799 (1969); Greene v. McElroy, 360 U.S. 474, 506–508, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959); Kent v. Dulles, 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed. 2d 1204 (1957). *See also* Arizona v. California, 373 U.S. 546, 585, 593, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963) (Harlan, J. dissenting); Watkins v. United States, 354 U.S. 178, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957); Banzhaf v. FCC, 132 U.S.App.D.C. 14, 25–28, 405 F.2d 1082, 1093–1096 (1968), cert. denied, 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93 (1969).