WE'VE CARRIED THE RICH FOR ·200 YEARS, LET'S GET THEM OFF OUR BACKS—JULY 4th COALITION

v.

The CITY OF PHILADELPHIA

and

The Commissioners of Fairmount Park.

Civ. A. No. 76–1711.

United States District Court,
E. D. Pennsylvania.

June 15, 1976.

Robert M. Fishman, Philadelphia, Pa., for plaintiffs.

Stephen Saltz, Asst. City Sol., Philadelphia, Pa., for defendant.

## MEMORANDUM OPINION

McGLYNN, District Judge.

Philadelphia is the focal point for the celebration of the 200th Anniversary of the Independence of the United States. Beginning January 1, 1976, a continuous series of programs and activities memorializing historic events and the growth of the nation has taken place and will continue to take place throughout the remainder of the Bicentennial Year. The high point, of course, will be the July 4th celebration, when hundreds of thousands of citizens, including the President of the United States, are expected to come to Philadelphia to demonstrate their dedication to the principles upon which this nation was founded.

The plaintiffs, who are an amalgam of self-styled dissidents,[1] desire to engage in a counter demonstration for the avowed purpose of dramatizing the injustices of the American System as it has evolved over the last two centuries. The targets of their rhetoric are an undefined class of persons designated as the "Rich". In the language of one of their broadsides, plaintiffs proclaim that they "will fight them (the Rich) on the day they choose to celebrate their bloodsoaked rule. We will come together thousands strong, to expose their crimes and build our movement, on that day and for the great battles ahead. On to Philadelphia." (D–1)

Pursuing these objectives, plaintiffs have requested the City or the Fairmount Park Commission to provide:

1. A permit for a parade beginning at 10:00 A.M. on July 4, 1976 involving 5,000

---

1. Members of the coalition are: Vietnam Veterans Against the War, Unemployed Workers Organizing Committee, Revolutionary Communist Party, Revolutionary Student Brigade, NY–NJ United Workers Organization, May 1st Workers Organization.

to 10,000 persons and following a route beginning on the Benjamin Franklin Parkway to 16th Street to John F. Kennedy Boulevard to 15th Street around City Hall to Broad Street, south on Broad Street to Walnut Street, and east on Walnut Street to Washington Square. (P–8)

2. A permit to use Washington Square Park at the Tomb of the Unknown Soldier of the American Revolution for a rally of 5,000 to 10,000 people between the hours of 11:00 A.M. to 2:00 P.M. on July 4, 1976. (P–1)

3. A permit for a rock concert or cultural-political event to be held on Belmont Plateau in Fairmount Park from 7:00 P.M. to 11:00 P.M. on July 3. (P–3), (P–9)

4. A permit to erect a tent city housing 2,000 people along Benjamin Franklin Parkway or in Fairmount Park for the period June 25, 1976 to July 6, 1976. (P–2)

5. A permit to erect a canopy-covered pavilion measuring 75′ x 75′ in Washington Square Park to graphically display the role of the working class.

The City and the Park Commission rejected these applications but offered alternative plans which the plaintiffs deem unacceptable. Plaintiffs then brought this action asserting a violation of their First Amendment Rights and they ask the Court to compel the City and the Fairmount Park Commission to issue the permits as requested.

### DISCUSSION

As a point of departure, it would be well to remember that the use of streets, parks, and other public places ". . . has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens." *Hague v. CIO,* 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939). But we must also keep in mind, the admonition of Mr. Justice Goldberg speaking for the Court in

*Cox v. Louisiana,* 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965), that "the rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time. The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy." 379 U.S. at 554, 85 S.Ct. at 464.

### I  THE PARADE PERMIT

Unfortunately, the plaintiffs' proposed line of march would bring them into direct conflict with a myriad of scheduled bicentennial activities, including services at Christ Church in the morning, a speech by the President of the United States at Independence Mall, and a 6 to 8 hour parade involving 50,000 participants and an estimated 300,000 spectators sponsored by Philadelphia '76 Incorporated, the Bicentennial Agency of the City of Philadelphia.

■ If anything is clear in the area of freedom of expression, it is that two parades cannot march on the same street simultaneously and the city may allow only one. *Cox v. New Hampshire,* 312 U.S. 569, 576, 61 S.Ct. 762, 85 L.Ed. 1049, 1053, 133 A.L.R. 1396 (1941).

While plaintiffs seem to concede this point, they have rejected any alternate route [2] which will not bring them into close proximity to the spectators and participants in the officially scheduled bicentennial activities.

The influx of hundreds of thousands of people and thousands of vehicles [3] into the bicentennial area [4] on July 4th will present traffic and crowd control problems of the greatest magnitude. The additional burden of providing for plaintiffs' groups on a separate march route in the impacted area may

---

2. The City has proposed routes in the Nicetown, Frankford and Far Northeast sections of the City, each of which terminates in a park suitable for a rally.

3. According to official police information, there will be 518 busses just to transport the bands participating in the bicentennial parade.

4. Vine Street to Pine Street, Delaware River to the Schuykill River.

prove insurmountable. Even peripheral contact between the two groups of marchers and/or spectators can cause confusion and affect the orderly progress of the parades.

Furthermore, I cannot overlook the fact that the vast majority of the people that day will be exercising First Amendment Rights by attending and participating in the officially sponsored activities. It seems to me that they ought to be free to do so without fear of interference from those who wish to promote an opposing view.

Moreover, in light of the plaintiffs' militant attitude and provocative posture as exemplified in their broadside (D–1), common sense dictates that the two parades should be kept separate in order to avoid any untoward incident which would trigger a confrontation and disrupt the peaceful activities of either or both groups.

■ Weighing the rights of the plaintiffs to express their grievances by a parade and rally against the competing First Amendment Rights of those attending the official ceremonies and taking into account the City's proper concern for public order and personal safety, I am persuaded that the plaintiffs should be permitted to hold their parade and rally but not within twelve (12) blocks of the regularly sponsored activities. If none of the three alternate routes proposed by the City are accepted by the plaintiffs, I will enter an Order directing the City to issue to the plaintiffs a permit for a parade to commence at 10:00 A.M. which will assemble and begin at Broad Street and Girard Avenue and march in an easterly direction on the north side of Girard Avenue (westbound lanes) to Second Street, north on Second Street Street to Susquehanna and east on Susquehanna to Norris Square Park.

## II THE RALLY

The same considerations which prompt a denial of the parade permit as requested are applicable to the use of the area of the Tomb of the Unknown Soldier in Washington Square Park for a political rally. Bearing in mind that Washington Square is within 100 feet of Independence Square, the center of the bicentennial activities, I am satisfied that a rally of the size proposed by the plaintiffs would severely impair the ability of citizens to view the memorial to the Unknown Soldier of the Revolution and to participate in the other events scheduled that day for other historic Shrines in the immediate vicinity. Moreover, it is extremely doubtful that Washington Square, because of its size, could accommodate the crowds projected for the plaintiffs' rally.

■ However, since the alternate parade routes suggested by the City and the Court terminate at a public park or square, I will direct the Commissioners of Fairmount Park to permit the plaintiffs to conduct a rally in the park at the end of the parade route finally selected by them.

## III THE CULTURAL EVENT

Plaintiffs also desire to use the Belmont Plateau in Fairmount Park during the hours of 7:00 P.M. to 11:00 P.M. on July 3, 1976 for a "political-cultural" event which will include country, folk and rock music presentations, skits, poetry and dramatic readings, with an estimated attendance of 10,000 people. Assuming, without deciding that this mode of expression is entitled to First Amendment protection, nevertheless in considering the legitimate interest of the City and Park Commission, I am convinced that primarily for reasons of public safety, such a program cannot be presented at that place and at that time.

First of all, it would place an intolerable burden on traffic control because of the very limited number of available parking spaces in the Belmont Plateau area. Vehicles bringing in 10,000 people would create a snarl of monumental proportions which could even affect the movement of traffic on the nearby Schuykill Expressway.

Secondly, the absence of adequate lighting on Belmont Plateau raises genuine problems of personal safety. According to the plaintiffs' time-table, the concert will extend beyond sundown for approximately two hours. The only illumination would

come from street lamps which are far removed from many areas of the Plateau. The safety of those in attendance is of compelling interest to the City and the Commissioners of Fairmount Park and is sufficient to overcome First Amendment objections to a refusal to permit a nighttime concert on Belmont Plateau—even a political one.

Another important consideration is the effect the political-cultural concert would have on the use of Belmont Plateau for recreational activities. The convergence of 10,000 people for a concert scheduled to begin at 7:00 P.M. will seriously impinge upon the rights of hundreds of Philadelphia residents who traditionally use the picnic areas and athletic fields of Belmont Plateau on the Fourth of July weekend.

■ It is not an abridgment of free speech if the limitation on the use of Belmont Plateau furthers an important government interest which is unrelated to suppression of free expression.

■ Under the circumstance presented here, it was not unlawful for the Commissioners of Fairmount Park to refuse to issue the permit for the political-cultural event.

### IV  THE TENT CITY

Plaintiffs are unable to cite any authority for the proposition that the erection of a tent city to accommodate 2000 people is a constitutionally protected right. Indeed, the authority is to the contrary. In a case involving a member of the plaintiff coalition *Vietnam Veterans Against The War v. Morton,* 164 U.S.App.D.C. 391, 506 F.2d 53 (1974), the Court held that "cooking and camping overnight, activities whose unfettered exercise is not crucial to the survival of democracy . . . are . . . beyond the pale of First Amendment protection." 506 F.2d at 57. The Court drew support for this conclusion from a prior ruling of the Supreme Court which reinstated an injunction of the District Court prohibiting the Vietnam Veterans Against The

War from camping on a public mall. *Morton v. Quaker Action Group,* 402 U.S. 926, 91 S.Ct. 1398, 28 L.Ed.2d 665 (1971).

■ Apart from the constitutional issue and the obvious considerations of health and safety, the City was justified in refusing a permit because the area designated by the plaintiffs has been preempted for other bicentennial activities.

### V  THE PAVILION

Plaintiffs also request space for a pavilion, 75 feet by 75 feet, in Washington Square to graphically demonstrate the role of the working class by means of films and other displays for the period June 1, 1976 to July 8, 1976.

■ Here again, while this manner of expression may be constitutionally protected, plaintiffs do not have an unrestricted right to present their message at that place during that period of time and in that manner.

If plaintiffs desire to use public property, in order to avoid any scheduling conflicts I will enter an Order that the City and the Commissioners of Fairmount Park, through Philadelphia '76 Inc., the official bicentennial coordinating agency, make suitable arrangements for the plaintiffs to offer an appropriate display on the same terms and conditions as other exhibitors.

Finally, plaintiffs request that I declare Regulation 10 of the Fairmount Park Commission unconstitutional for vagueness. I decline to do so because as applied in the context of this case, the denial of permits for the use of park facilities was based upon constitutionally permissible grounds.