The KNIGHTS OF THE KU
KLUX KLAN, etc.

v.

MARTIN LUTHER KING JR.
WORSHIPPERS, et al.

Thomas ROBB, et al.

v.

CITY OF PULASKI, et al.

Nos. 1–90–0002, 1–90–0003.

United States District Court,
M.D. Tennessee,
Nashville Division.

April 19, 1990.

George E. Barrett, P.C., Nashville, Tenn., for plaintiffs.

Scott Shepherd, Harrison, Ark., pro se.

Patrick O'Rourke, Craig & Hughes, Nashville, Tenn., and Jack Henry, Robert C. Henry, Pulaski, Tenn., for defendants.

## MEMORANDUM

JOHN T. NIXON, District Judge.

Before the Court in docket no. 1–90–0002 is an action for declaratory and injunctive relief brought by the Knights of the Ku Klux Klan against a group known as the Giles Countians United (which the Ku Klux Klan has referred to as the "Martin Luther King Jr. Worshippers") and the following individuals: Bettie Higgins, the executive director of the Giles County Chamber of Commerce and board member of the Giles Countians United; James Abernathy, the Superintendent of Schools for Giles County, Tennessee; Hal Stewart, the Mayor of Pulaski, Tennessee; and John Henry Watkins, Raymond E. Rhodes, Jr., Dan Speer, Mitchell Birdsong, Jr., Bill Cheatham, and Johnny Bevill, Aldermen of the City of Pulaski, Tennessee.

The Court hereby consolidates the action in docket no. 1–90–0002 with the action in docket no. 1–90–0003 concerning the same issues filed by the American Civil Liberties Union on behalf of the national director and regional representative of the Ku Klux Klan. In docket no. 1–90–0002, the Ku Klux Klan has come before the Court without counsel. In light of the consolidation and the similar identity of the plaintiffs in the two actions, the Court deems plaintiff's counsel of record in 1–90–0003 to have also served as counsel for the Ku Klux Klan in the portion of 1–90–0002 seeking declaratory and injunctive relief.

## I

This action arose out of a dispute over the Ku Klux Klan's intention to assemble and parade in the City of Pulaski on January 13, 1990 in protest of the Martin Luther King, Jr. National Holiday.

On August 7, 1989, defendant Bettie Higgins, as executive Director of the Giles County Chamber of Commerce, filed with the City of Pulaski a request to hold a parade in downtown Pulaski from 1:00 p.m. to 3:00 p.m. on January 13, 1990 in "observance of the birthday of Dr. Martin Luther King." On August 7, 1989, the City of Pulaski granted the Giles County Chamber of Commerce a permit to hold a parade on January 13, 1990. Between August 7, 1989 and October 17, 1989, Bettie Higgins, on behalf of the Giles County Chamber of Commerce and the Giles Countians United, secured additional parade permits for January 14 and 15, 1990 and a meeting permit for January 12, 1990.

On October 23, 1989, Thomas Robb, national director of the Knights of the Ku Klux Klan, wrote to defendant Hal Stewart, the Mayor of Pulaski, stating the intent of the Ku Klux Klan to hold its "Homecoming" assembly in Pulaski on January 13, 1990, contending that the Ku Klux Klan's parade permit was "lawfully secured by the fact that such rallies which have traditionally been held on the Saturday before Martin Luther King's National Holiday are now a long standing custom." The Ku Klux Klan had previously protested the holiday by holding "Homecoming" events in Pulaski on January 18, 1986, January 17, 1987, January 16, 1988, and January 14, 1989 pursuant to permits approved by the City of Pulaski.

On October 30, 1989, Mayor Hal Stewart replied to Mr. Robb's letter, stating that he did not consider Mr. Robb's letter to consti-

tute a request for a parade permit, informing Mr. Robb that a parade permit had already been issued to another group for the weekend of January 12, 13, 14, 15, 1990, and disagreeing with Mr. Robb's contention that the Ku Klux Klan's past rallies had sufficed to secure a permit for future rallies on the same date.

On November 2, 1989, the Board of Mayor and Aldermen of the City of Pulaski passed Ordinance No. 14, 1989, being "An Ordinance Amending Section 12–810 of the Pulaski Municipal Code Regulating Parades." Ordinance 14 provided, *inter alia*, that a parade permit would be required for "any meeting, parade, demonstration, exhibition or event on the streets of the City of Pulaski"; that the City would only grant one parade permit per month; that permits would be granted to the first applicant for a given date; that permit applications were required to be filed no sooner than 180 days and no later than 45 days prior to the proposed parade date; that permits would not be granted if a conflicting event had already been scheduled; that permits would not be granted if the City anticipated violence; that permits would not be granted to groups that advocated unlawful acts, racial intimidation, or the overthrow of the government; that permits would not be granted for parades of more than 250 marchers; and that marchers were not allowed to wear masks or disguises.

On November 15, 1989, Thomas Robb, as national director of the Knights of the Ku Klux Klan, filed with the City of Pulaski requests for permits to hold parades on January 20, 1990 and February 3, 1990 to "celebrate Klan Homecoming." On November 16, 1989, Robb submitted a request for a permit to hold a parade on January 13, 1990 at 3:00 p.m. "to celebrate Klan Homecoming."

On November 21, 1989, the Board of Mayor and Aldermen of the City of Pulaski rejected Robb's request to parade on January 13, 1990 "since another permit has been granted for the requested date." The Board also rejected Robb's request to parade on January 20, 1990 "since another permit has been granted for the month of

January." On November 22, 1989, however, the Board granted the Knights of the Ku Klux Klan a permit to parade on February 3, 1990.

On or before November 11, 1989, the principal of Giles County High School in Pulaski, Tennessee scheduled thirteen games of the Biddy Basketball League to be played at the Giles County High School on January 13, 1990. On or between November 21, 1989 and November 26, 1989, the Ku Klux Klan submitted a request to James Abernathy, Superintendent of Giles County Schools, for the use of the Giles County High School on January 13, 1990. On December 1, 1989, James Abernathy denied the Ku Klux Klan's request to use the High School on the grounds that the High School had already been reserved for January 13, 1990.

On December 20, 1989, Thomas Robb, as national director of the Knights of the Ku Klux Klan, filed with the City of Pulaski a request for a permit to hold a parade on January 13, 1990 from 10:30 a.m. til 12:00 p.m. "to celebrate Klan Homecoming." On January 3, 1990, the Board of Mayor and Aldermen of the City of Pulaski rejected Robb's second request to parade on January 13, 1990 "since another permit has already been issued for this date."

On January 3, 1990, the Ku Klux Klan filed this action seeking: (1) declaratory judgment that Pulaski Ordinance No. 14 is unconstitutional on its face and as applied to the Ku Klux Klan; (2) an order enjoining the City of Pulaski from interfering with the Ku Klux Klan's proposed January 13, 1990 "Homecoming" parade; and (3) an order enjoining the Superintendent of Giles County Schools from denying the Ku Klux Klan the use of the Giles County High School on January 13, 1990. The Ku Klux Klan has also brought a claim for damages, which will not be considered in this opinion.

II

In examining the constitutionality of Pulaski Ordinance No. 14, the Court must first note that the Ordinance gives Pulaski officials "the power to deny use of a forum in advance of actual expression,"

*Southeastern Promotions v. Conrad*, 420 U.S. 546, 553, 95 S.Ct. 1239, 1244, 43 L.Ed.2d 448 (1975), and is thus a prior restraint which "comes to this Court with a heavy presumption against its constitutional validity." *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419, 91 S.Ct. 1575, 1578, 29 L.Ed.2d 1 (1971).

> The presumption against prior restraints is heavier—and the degree of protection broader—than that against limits on expression imposed by criminal penalties. Behind the distinction is a theory deeply etched in our law: a free society prefers to punish the few who abuse rights of speech *after* they break the law than to throttle them and all others beforehand. It is always difficult to know in advance what an individual will say and the line between legitimate and illegitimate speech is often so finely drawn that the risks of freewheeling censorship are formidable.

*Southeastern Promotions v. Conrad*, 420 U.S. at 559, 560, 95 S.Ct. at 1246, 1247. (Emphasis in original).

■ The City of Pulaski has the right to control the use of its streets and public property by regulating parades and demonstrations to reasonable times, places, and manners through a permit system. *Cox v. New Hampshire*, 312 U.S. 569, 575, 61 S.Ct. 762, 765, 85 L.Ed. 1049 (1941). The regulations governing the availability of parade permits, however, may not be so overly broad as to allow discriminatory application to stifle the expression of unpopular groups such as the Ku Klux Klan. *Heffron v. International Society for Krishna Consciousness, Inc.*, 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981); *Grayned v. City of Rockford*, 408 U.S. 104, 109, 92 S.Ct. 2294, 2299, 33 L.Ed.2d 222 (1972).

■ Paragraph (k) of Pulaski Ordinance 14 provides that "[t]he City of Pulaski shall deny a parade permit to any individual or group based on anticipation of violence being instigated or riots incited by such individual or group under circumstances when, at the time of the application for the permit, there is a clear and present danger of imminent lawless action." In *Hague v. CIO*, 307 U.S. 496, 516, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939), the United States Supreme Court considered the constitutionality of a similar ordinance which authorized a government official to deny a permit to hold a public meeting if the denial would prevent "riots, disturbances, or disorderly assemblages." The Supreme Court found the ordinance to be unconstitutional since it could

> be made the instrument of arbitrary suppression of free expression of views on national affairs, for the prohibition of all speaking will undoubtedly 'prevent' such eventualities. But uncontrolled official suppression of the privilege cannot be made a substitute for the duty to maintain order in connection with the exercise of the right. *Id.*

■ Paragraph (k) of Ordinance 14 is similarly unconstitutional because it allows too much latitude for discriminatory denial of the First Amendment right to free speech. Furthermore, the constitutionality of paragraph (k) is not preserved by limiting the power to deny permits to situations where, "at the time of the application for the permit, there is a clear and present danger of imminent lawless activity." Such language is without effect in the midst of a statute requiring permits to be applied for 45 days before the parade date. The imminence of danger or of unlawful activity depends upon the *immediate* circumstances surrounding the expression, including the content of expression, size and makeup of the speakers and audience, and the sufficiency of the police presence. *Edwards v. South Carolina*, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963). It is impossible for these factors to be known 45 days before the parade, and accordingly there can be no clear and present danger at the time of application sufficiently clear to justify denial of a parade permit.

In 1965, the United States District Court for the Middle District of Alabama considered the constitutionality of state interference with the march of black civil rights leaders from Selma to Montgomery, Alabama and found that under the United

States Constitution, "[the Governor of Alabama's] contention that there is some hostility to this march will not justify its denial. Nor will the threat of violence constitute an excuse for its denial." *Williams v. Wallace*, 240 F.Supp. 100, 109 (1965). (citations omitted). As the threat of violence could not be used to abridge the First Amendment rights of civil rights marchers in 1965, it may not be used to abridge the rights of the Ku Klux Klan in 1990. The duty of Pulaski is not to suppress the speech of the Ku Klux Klan, but to "maintain order in connection with the exercise of the right." *Hague v. CIO*, 307 U.S. at 516, 59 S.Ct. at 964.

■■■ Paragraph (m) of Pulaski Ordinance 14 provides that "[n]o permit shall be granted to any person or groups advocating unlawful acts by groups or individuals against other persons or groups for the purpose of inciting and provoking damage to property and bodily injury or death ..." In *Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969), the Supreme Court held unconstitutional an Ohio statute under which a Ku Klux Klan member had been convicted for "advocating the duty, necessity or propriety of crime, sabotage, violence or unlawful methods of terrorism as a means of accomplishing industrial or political reform." 395 U.S. at 444–445, 89 S.Ct. at 1828. The Court found that "the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Id.*, 395 U.S. at 447, 89 S.Ct. at 1829. Under the *Brandenburg* standard, paragraph (m) is unconstitutionally overbroad because it allows the suppression of the mere advocacy of violence even where there is no likelihood that dangerous or unlawful activity will result. The abstract advocacy of violence is protected by the First Amendment.

■■ Paragraph (m) also requires that parade permits be denied to "any person or groups who maliciously and with specific intent to intimidate or harass another person because of that person's race, color, religion, ancestry, or national origin to cause physical injury to another person, to damage, destroy, or deface any real or personal property of another person or to threaten, by word or act, to do any physical injury to another person or damage to the property of another person." In *Collin v. Smith*, 578 F.2d 1197, 1199 (7th Cir.1978), the Seventh Circuit Court of Appeals found unconstitutional a Skokie, Illinois ordinance which forbade permits for assemblies which would "incite violence, hatred, abuse or hostility toward a person or group of persons by reason of reference to religious, racial, ethnic, national or regional affiliation." The Court of Appeals found that

[t]he problem with engrafting an exception on the First Amendment for such situations is that they are indistinguishable in principle from speech that 'invites dispute, induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger' [which] are among the 'high purposes' of the First Amendment.

*Id.* at 1246 (quoting *Terminiello v. Chicago*, 337 U.S. 1, 4, 69 S.Ct. 894, 895, 93 L.Ed. 1131 (1949)).

The Court follows the guidance of the Seventh Circuit Court of Appeals in finding that the racially antagonistic speech that paragraph (m) attempts to suppress is protected by the First Amendment. Paragraph (m) is thus unconstitutional. "Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339, 340, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974).

[9] Paragraph (n) of Pulaski Ordinance 14 provides that "No permit shall be granted to any person or group who advocates treason against or the overthrow of the government of the United States of America." This provision is unconstitutionally overbroad because it allows the suppression of mere advocacy even where the ad-

vocacy is not "directed to inciting or producing imminent lawless action" and is not "likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. at 447, 89 S.Ct. at 1829. In the absence of such imminent or likely threat, such speech advocating treason or overthrow is protected political speech under the First Amendment and may not be suppressed. *Id.; Yates v. United States*, 354 U.S. 298, 320, 77 S.Ct. 1064, 1078, 1 L.Ed.2d 1356 (1957).

■ Paragraph (*o*) of Pulaski Ordinance 14 prohibits parade participants and individuals disseminating literature from wearing masks or disguises "to the disturbance of the peace or to the alarming of the citizens." In the context of parades and demonstrations, certain masks and disguises may constitute strong symbolic political expression that is afforded protection by the First Amendment. *Collin v. Smith*, 578 F.2d at 1200; *Tinker v. Des Moines Independent School District*, 393 U.S. 503, 505, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969). In *Collin v. Smith*, 578 F.2d at 1200, the Seventh Circuit Court of Appeals considered an ordinance prohibiting demonstrations while wearing military-style uniforms or clothing of symbolic significance. The ordinance was passed to prevent marchers from wearing Nazi style uniforms while marching through the predominantly Jewish village of Skokie, Illinois. *Id.* at 1199, 1200. The Court of Appeals recognized that the demonstration "would seriously disturb, emotionally and mentally, at least some, and probably many of the Village's residents," but found that such disturbance, alarm or trauma could not justify the suppression of the clearly symbolic expression. *Id.* at 1206. " 'Any shock effect ... must be attributed to the content of the ideas expressed. It is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers.' " *Id.* (quoting *Street v. New York*, 394 U.S. 576, 592, 89 S.Ct. 1354, 1366, 22 L.Ed.2d 572 (1969). The Court finds the above reasoning to be persuasive. Accordingly, the Court finds that paragraph (*o*) of the Pulaski Ordinance is unconstitutionally overbroad because it may be used to stifle symbolic political expression which is protected by the First Amendment.

■ Paragraph (h) of the Pulaski Ordinance restricts permits to groups of less than 250 marchers. Such a limitation is unduly restrictive in light of the number of police officers from across the state which Pulaski has at its disposal for these parades and in light of the testimony that past Ku Klux Klan parades have been held in Pulaski with more than 400 marchers without violence. Accordingly, the Court finds paragraph (h) to be an unreasonable and unconstitutional restriction upon the exercise of First Amendment rights.

■ Paragraph (d) of Pulaski Ordinance 14 provides that "[n]o permit shall be granted to any person or group when conflicting events and parades have already been approved by the City of Pulaski under this section, or a predecessor section of the Municipal code." The second sentence of paragraph (e) provides that "[p]ermits will be granted to the person or group first applying under a proper application meeting the requirements of this section." Pursuant to these provisions, the City of Pulaski denied the Ku Klux Klan a parade permit for January 13, 1990 on the grounds that a permit had already been granted for that day to a prior applicant. While two marches a day may be feasible in a larger community such as Nashville, the Court finds that it is perfectly reasonable and constitutional for a small city such as Pulaski to limit public demonstrations on its streets to once per day and deny subsequent applications for the same day on the basis of conflict. *See We've Carried the Rich v. City of Philadelphia*, 414 F.Supp. 611 (E.D.Pa.1976), aff'd 538 F.2d 322 (3rd Cir.1976); *Holland v. Wilson*, 737 F.Supp. 82 (M.D.Ala.1989). Furthermore, it is proper to grant the permit to the first group that applies for it, as this practice does not allow for discrimination on the basis of the content of an applicant's speech. These provisions are the type of reasonable restrictions upon the use of public streets that a city may constitutionally apply. *Cox v. New Hampshire*, 312 U.S. at 576, 61 U.S. at 766; *Grayned v. City of Rockford*, 408 U.S. at 109, 92 S.Ct. at 2299.

■ The Ku Klux Klan does not deny that the Giles County Chamber of Commerce secured the January 13, 1990 parade rights more than three months before the Ku Klux Klan submitted its first application to parade on that day. The Ku Klux Klan contends, however, that the City of Pulaski conspired with the Giles County Chamber of Commerce for the Chamber of Commerce to secure the parade rights for January 13, 1990. Parties do not "conspire" when they perform acts which they have a legal right to perform, and there can be no serious contention that the Chamber of Commerce did not have the legal right to secure a parade permit for January 13, 1990 or that the City did not have the legal right to grant the permit to the Chamber of Commerce as the first applicant for that date. Furthermore, since the Ku Klux Klan was denied its permit pursuant to the workings of a reasonable provision that was not discriminatorily applied, the subjective intent behind the denial of the permit or the enactment of the provision is irrelevant.

■ The Ku Klux Klan also contends that under the "Common Law Rights of Precedence" the Ku Klux Klan has a perpetual right to march on January 13, 1990 since it has marched on or about that date for the last four years. No such right exist in common, statutory or constitutional law, and the Ku Klux Klan was thus properly denied a parade permit to march on January 13, 1990.

Accordingly, the Court finds that the Ku Klux Klan has no right to parade in the City of Pulaski on January 13, 1990. Therefore, the Court must deny the Ku Klux Klan's request to enjoin defendants from interfering with the Ku Klux Klan's proposed January 13, 1990 "Homecoming" parade in the City of Pulaski.

■ The Ku Klux Klan was also denied a permit to march on January 20, 1990 pursuant to the first sentence of paragraph (e) of Pulaski Ordinance 14 which provides that "[n]o more than one parade permit per month will be granted by the City." The testimony presented to the Court at the hearing on this action has demonstrated that there is no legitimate basis for this once-a-month restriction: the City of Pulaski did not have more than 8 parades in 1989 and thus the demand upon the public streets does not justify such an extreme limitation upon their access. Moreover, there has been no contention that there may be any conflict between events that may happen weeks or even days apart. Counsel for the City of Pulaski has admitted that this provision was intended solely to prevent the Ku Klux Klan from exercising its First Amendment rights in the month of January near the controversial date of the Reverend King's holiday. Such a purpose has no constitutional legitimacy, and in the absence of a legitimately significant interest justifying the restriction as reasonable, the Court finds paragraph (e)'s once-a-month restriction to be unconstitutional. Accordingly, the Ku Klux Klan must be allowed to march on any day in January for which a conflicting event has not already been scheduled.

■ The Ku Klux Klan has also asked the Court to enjoin the Superintendent of Giles County Schools from denying the Ku Klux Klan the use of the Giles County High School on January 13, 1990. The Ku Klux Klan must be allowed equal access to the Giles County High School. As the testimony has established that the High School is ordinarily used for public events of all types, it may not be discriminatorily closed to the use of the Ku Klux Klan. *Widmar v. Vincent,* 454 U.S. 263, 267, 102 S.Ct. 269, 273, 70 L.Ed.2d 440 (1981).

■ The Court finds, however, that even though the Ku Klux Klan was denied use of the Giles County High School for January 13, 1990, the Ku Klux Klan was neither discriminated against nor denied equal access to the school. Access was granted to the first applicant for the facility's use, the Biddy Basketball League, and denied to all subsequent applicants regardless of their intended use. There has been no showing that this rule of access was not equally applied to the Ku Klux Klan as it was applied to all other applicants. The guarantees of equal access and freedom from discrimination do not give the Ku Klux Klan the right of absolute, unqualified access to the Giles County High

School. "The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time." *Cox v. Louisiana,* 379 U.S. 536, 554, 85 S.Ct. 453, 464, 13 L.Ed.2d 471 (1965). It is reasonable and constitutionally permissible for Giles County to prohibit a group from using its high school on the date for which another group has reserved the facility. *See We've Carried the Rich v. City of Philadelphia,* 414 F.Supp. 611 (E.D.Pa.1976), aff'd 538 F.2d 322 (3rd Cir. 1976); *Holland v. Wilson,* 737 F.Supp. 82 (M.D.Ala.1989).

Accordingly, the Court finds that the Ku Klux Klan was rightfully denied permission to use the Giles County High School on January 13, 1990 and has no legal or constitutional right to use the High School on that date. Since the Ku Klux Klan has no right which could be injured by the proposed action, the Court must deny their request to enjoin the Superintendent of Giles County Schools from denying the Ku Klux Klan the use of the Giles County High School on January 13, 1990.

### SUMMARY

For the above stated reasons, the Court finds that paragraphs (h), (k), (m), (n), (*o*), and the first sentence of paragraph (e) of Pulaski Ordinance 14 are unconstitutional and must be stricken from the Ordinance. The remaining provisions of the Pulaski Ordinance, however, are severable and retain their legal effect.

The Court finds that the City of Pulaski unconstitutionally denied the Ku Klux Klan members' first Amendment rights to assembly and free speech by denying the Ku Klux Klan's parade request for January 20, 1990. The Ku Klux Klan has the right to parade on the streets of the City of Pulaski on any day for which another group has not previously applied, subject to the remaining provisions of the Pulaski parade ordinance and other reasonable time, place, and manner restrictions.

The Court also finds, however, that the City of Pulaski did not act in violation of the Constitution by denying the Ku Klux

Klan's parade request for January 13, 1990 and that the Ku Klux Klan has no legal or constitutional right to parade in the City of Pulaski on January 13, 1990.

Furthermore, the Court finds that the Superintendent of Schools for Giles County did not violate the Constitution by denying the Ku Klux Klan's request to use the Giles County High School on January 13, 1990 and that the Ku Klux Klan has no legal or constitutional right to use the school on that date.

Accordingly, since the Ku Klux Klan has no right to parade on the streets of Pulaski or assemble in the Giles County High School on January 13, 1990, the Court must deny their requests for injunctive relief.

An Order will be entered contemporaneously with this Memorandum.